**John EVANS, Trustee in Bankruptcy for Hempfield Stores, Inc., a Bankrupt, Appellant,**

v.

**S. S. KRESGE COMPANY, a Foreign Corporation, Appellee.**

**Nos. 75–1782 and 76–1181.**

United States Court of Appeals, Third Circuit.

Argued Feb. 27, 1976.

Decided Nov. 2, 1976.

Howard A. Specter, David R. Brown, Litman Litman Harris & Specter, P.A., Pittsburgh, Pa., for appellant.

Richard M. Abrams, Michael M. Baylson, Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee; James C. Tuttle, Troy, Mich., of counsel.

Before ADAMS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal requires us to examine the business and license arrangement into which the parties entered to determine if the price and product restrictions imposed upon the licensee constituted an antitrust violation. We conclude that we have jurisdiction to conduct this inquiry and that the defendants did not violate Section 1 of the Sherman Anti-Trust Act by their marketing requirements.

The plaintiff, trustee in bankruptcy for Hempfield Stores, Inc. ("Hempfield"), brought this treble-damages suit under Section 4 of the Clayton Act, 15 U.S.C. § 15, against the S. S. Kresge Co. ("Kresge") for its alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] The district

---

1. Section 4 of the Clayton Act provides:

   Any person who shall be injured in his business . . . by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained, . . . . .

   Section 1 of the Sherman Act provides:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of

court, 394 F.Supp. 817 (W.D.Pa.1975), granted Kresge's motion for summary judgment. First, it held that subject matter jurisdiction was lacking, as "the activities complained of did not occur in the flow of interstate commerce nor did they substantially affect it." 394 F.Supp. at 833. Second, despite its conclusion that jurisdiction was lacking, the court discussed and found that Kresge's conduct did not violate the Sherman Act: "the license agreements challenged here had a legitimate primary purpose; [furthermore,] the alleged restraints of trade were not unreasonable and are justifiable under the ancillary restraints doctrine." *Id.* at 849.[2] Hempfield appeals from the judgment in favor of Kresge.[3]

■ We conclude, contrary to the conclusion of the district court, that Sherman Act subject-matter jurisdiction was present. However, as we also conclude that on this record the alleged restraints of trade were justifiable under the rule of reason, we affirm the district court's judgment for Kresge.[4]

## I.

Briefly, the facts are as follows:[5] Under the registered exclusive service trade name "K-Mart", Kresge operates a number of discount department stores. The district court's opinion states:

> Defendant has used the "K-Mart" trade name in an effort to develop a reputation as a low mark-up, highly competitive merchandiser selling quality merchandise at discount prices. From its inception the plan was designed and its success was dependent on high volume sales with a low per item profit margin. Kresge felt that the best way to achieve high volume sales was to draw on the potential buying power of those who made frequent food purchases. However, since Kresge had no prior experience in food merchandising and did not have any source of distribution, it elected to license its registered trade name to independent food store operators who would conduct a K-Mart Food Store operation as part of or adjacent to a K-Mart department store. This arrangement, it was felt, would provide "one-stop shopping" and enhance customer acceptance of the K-Mart program.

394 F.Supp. at 824. In 1964, Hempfield opened two food stores sharing the same building with K-Mart stores. By agreement with Kresge, Hempfield was permitted to use the name "K-Mart Foods" for a

---

trade or commerce among the several States, . . . is declared to be illegal.

2. The district court declined to consider Kresge's third line of defense—the doctrine of *in pari delicto, see Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). By reason of our disposition, we similarly express no opinion on that issue. Nor need we examine the district court's deferral to the bankruptcy court of certain issues raised by way of counterclaim, *see* 394 F.Supp. at 824, 849, inasmuch as these issues have not been presented to us on this appeal.

3. The district court's opinion of May 13, 1975 was not accompanied or followed by a separate order as required by F.R.Civ.P. 58, *see Dougherty v. Harper's Magazine Co.,* 537 F.2d 758, 762 (3d Cir. 1976). Thereafter, an amended order entering final judgment pursuant to Rule 54(b) was filed on February 11, 1976, at Docket No. 76–1181. The original action, at No. 75–1782, was then consolidated with No. 76–1181 for purposes of our review.

4. Reversal of a jurisdictional decision adverse to the plaintiff would normally require a remand to the district court for consideration of the merits. Here, however, the district court was careful to anticipate this possibility, *see* 394 F.Supp. at 843, and thus made its analysis of the merits available to us. Additionally, we observe that the substantive and jurisdictional inquiries here bear marked similarities. We are satisfied that the district court's careful and separate consideration of the merits, although unnecessary to its holding, does not require a remand, particularly since there are no material facts in dispute. *See id.* In such circumstances, we may affirm a district court judgment, albeit on a different ground. *Cf. PAAC v. Rizzo,* 502 F.2d 306, 308 n. 2 (3d Cir. 1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975).

5. The facts are set out in greater detail in the district court opinion, 394 F.Supp. at 824–27. That opinion informs us that "both parties agree that there are no issues of material fact precluding summary judgment." *Id.* at 843.

term of years at each store. Hempfield operated both stores until July 1969, when its leases were terminated. Hempfield's petition in bankruptcy followed shortly.

The Hempfield grocery stores, although "under one roof" with the K-Mart store, under the K-Mart name and thus presented to the public as a part of the K-Mart complex, were in fact run independently. Once past the supermarkets' K-Mart marquees, this independence became obvious:

> None of the goods sold by Hempfield was permitted to carry the K-Mart or any other Kresge brand name. Nor was Hempfield permitted to use the name "K-Mart" on its checks, its business stationery or even its pricing labels. Neither sold any goods or services to the other and Kresge did not dictate Hempfield's source of supply.[6]

Most of Hempfield's groceries came from a local Pennsylvania wholesaler, Fox Grocery Company. Still, Hempfield "received a substantial quantity of goods via direct shipment from out of state suppliers which amounted to in excess of $400,000 per year at cost."[7] Gross annual sales at the two stores amounted to approximately four million dollars. Most of this amount came from the sale of groceries. A small percentage of Hempfield's sales (about 2–5%)[8] came from those non-food items "customarily found in grocery stores, e. g., health and beauty aids."[9]

The district court summarized the various provisions of the license agreements giving rise to the plaintiff's complaint. Under these provisions, Hempfield was required to:

> (1) charge prices identical to those charged by Kresge on "like items," i. e., items sold by both the food stores and the department stores which prices were established by defendant in the event the parties were unable to arrive at a mutually agreeable price; [(2)] maintain merchandise "competitive" in price with the same or similar goods offered for sale in the trading area; (3) limit non-food merchandise offered for sale to specific categories of goods; (4) refrain from entering into fair trade agreements; (5) refrain from issuing trading stamps without express permission from Kresge; and (6) use certain equipment furnished by defendant.[10]

Kresge responded by claiming a lack of subject matter jurisdiction and by denying that the restrictions contained in the agreements between the parties constituted unreasonable restraints of trade. In support of its motion for summary judgment, Kresge filed an affidavit of Frank J. Zapalla, Jr., who was the former secretary of SkatZap, Inc. (the predecessor corporation to Hempfield) and was the individual who negotiated the Kresge license that is the subject of this litigation. The uncontested portions of his affidavit reveal that (1) both parties fully intended that the food operation be presented to the public as one with the K-Mart department store;[11] (2) neither party contemplated or intended that it would compete with the other;[12] and (3) that the "like items" price restrictions were generally acceptable to Hempfield's predecessor[13] and applied only to goods not pur-

---

6. District Court Opinion, *id.* at 825.

7. *Id.* The precise amount of such purchases cannot be determined, "as it appears that the bankrupt's records are incomplete in many respects." *Id.* The uncontradicted affidavit of Anthony Polito does disclose that Hempfield purchased merchandise from out-of-state suppliers during the *first half* of 1969 in the amount of $215,875.13. App. at 447a. "These records reflect interstate purchases, therefore, at an annual rate in excess of $430,000.00." *Id.*

8. *See* 394 F.Supp. at 847.

9. *Id.* at 825–26 (footnote omitted.)

10. *Id.* at 826. Although the district court discussed the restrictions concerning fair trade agreements, trading stamps and tie-in equipment, ruling in each instance against the plaintiff, the plaintiff has not raised these issues on this appeal. Accordingly, we limit our discussion and analysis to the pricing and product policies imposed by Kresge under its agreements.

11. *See* ¶ 6, App. at 402a; ¶ 9, *id.* at 403a–04a; ¶ 12, *id.* at 405a; ¶ 17, *id.* at 407a.

12. *See* ¶ 8, App. at 403a; ¶ 9, *supra.*

13. ¶ 11, App. at 405a.

chased from Kresge and, at the retail level, "freely available to the public at competitive prices in other stores throughout the [relevant] marketing area." [14]

For its part, Hempfield, in an effort to substantiate jurisdiction, sought additional pretrial discovery, which the district court denied. That ruling is appealed, as is the district court's grant of summary judgment in favor of Kresge.

## II.

In holding that Hempfield's suit was barred by a lack of Sherman Act subject-matter jurisdiction, the district court characterized its inquiry as: "Does the defendant's conduct have a sufficient relationship with interstate commerce so as to be a proper subject of federal regulation?" 394 F.Supp. at 827.

The district court measured this relationship by the allegations in Hempfield's complaint. Those allegations, as the district court noted,[15] "must allege either (1) activities that are in the flow of interstate commerce, or (2) activities which though occurring purely on a local level substantially affect interstate commerce." *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 50 (3d Cir. 1973) (citations omitted.) In other words, the district court required the plaintiff to meet either the test of "in commerce" or that of "affecting commerce":

> If an alleged restraint occurs within the flow of interstate commerce, that is "in commerce," substantial effect on that commerce is presumed as a matter of law and no showing need be made that any

particular amount of commerce has been affected. On the other hand, when dealing with restraints which are alleged merely to have affected interstate commerce, that effect must be substantial in order to justify federal regulation.

394 F.Supp. at 829. As our discussion need only address the "affecting commerce" test,[16] we focus our inquiry on the element of substantiality.

As noted by the court in *Rasmussen v. American Dairy Association,* 472 F.2d 517 (9th Cir.), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973): [17]

> There is no bright line dividing cases in which the effect upon interstate commerce is sufficient to permit Congress to prohibit particular anticompetitive activity under the commerce clause from those cases in which it is not sufficient. In this area perhaps more than in most, each case must turn on its own facts.

*Id.* at 526.[18] The absence of such a bright line troubled this Court in *Doctors, supra,* and it remains to trouble us here.

*Doctors* involved a suit by a single hospital against the consortium that coordinated health care services in the Philadelphia area. Blue Cross, the defendant, sought to terminate the plaintiff hospital's membership, an action which plaintiff alleged had been taken in an attempt by Blue Cross to control all hospital services in the area. This Court, looking only to the fact that "the volume of supplies which are allegedly purchased by [the hospital] from companies located outside Pennsylvania each year [$233,430 in 1972] will be affected by the alleged activities," [19] found a substantial ef-

14. ¶ 10, App. at 404a.

15. 394 F.Supp. at 828.

16. The district court devoted a considerable part of its opinion to the application of the "in commerce" test to the facts of this case. *See* 394 F.Supp. at 833–37. Our disposition of the jurisdictional issue relieves us of any need to consider the "in commerce" theory. *See Doctors, supra,* at 50–51:

> We have made no attempt to judge the adequacy of every one of the plaintiff's allegations on the interstate commerce issue since jurisdiction is established if any one of

> them satisfies either of the criteria for interstate commerce.

> We thus express no opinion on the "in commerce" portion of the district court opinion.

17. And quoted by the court below, 394 F.Supp. at 830.

18. *See also Hospital Building Co. v. Trustees of Rex Hospital,* 511 F.2d 678, 685 (4th Cir. 1975) (en banc), *rev'd,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

19. *Doctors, supra,* 490 F.2d at 51.

fect on interstate commerce and, therefore, held that Sherman Act jurisdiction was established.

The *Doctors* panel was careful to note, however, that the "affecting commerce" test would still be a bar to jurisdiction in some actions. 490 F.2d at 53–54, *citing Lieberthal v. North Country Lanes*, 332 F.2d 269 (2d Cir. 1964) *and Page v. Work*, 290 F.2d 323 (9th Cir.) *cert. denied*, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961). At the time the instant case was argued before us, this admonition weighed even more heavily upon us, as other Circuits had augmented our observation in opinions restricting Sherman Act jurisdiction. Chief among those cases was the Fourth Circuit's en banc decision in *Hospital Building Co. v. Trustees of Rex Hospital*, 511 F.2d 678 (4th Cir. 1975).

*Hospital* was a suit by the operator of a 49-bed proprietary hospital in Raleigh, North Carolina. The plaintiff hospital planned a major expansion that would increase its size to 140 beds. Its complaint alleged that Rex Hospital, a private tax-exempt hospital, acted in concert with other named defendants in an effort to block the proposed expansion and thus monopolize hospital services in Raleigh. The Court of Appeals found the principal "affecting commerce" allegations to be that "[n]either the hospital's interstate purchases of supplies and equipment, its billings to national insurance companies and the federal government, nor its purchases of management services from its parent [out-of-state] corporation have increased as they would were the hospital to expand." 511 F.2d at 683–84 (footnotes omitted.) The court found these effects insufficient, reasoning that (1) the consequences were not the result of conduct directed at interstate commerce, and (2) the impact was "negligible." *Id.* at 684.

*Hospital* did not appear to furnish an answer to the jurisdictional question with which we were confronted. For example, the plaintiff hospital's out-of-state purchas-

es found to be insufficient in that case totalled but $112,846, whereas Hempfield's out-of-state purchases were in the considerably larger amount of $400,000.[20] It thus appeared that Hempfield's complaint would present a case squarely astride this indistinct jurisdictional line. Upon the Supreme Court's grant of certiorari in *Hospital*, 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37 (1975), we elected to delay our decision in this case to await its disposition. The Supreme Court's reversal in *Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), convinces us that the facts here warrant the assumption of Sherman Act subject-matter jurisdiction.

The Supreme Court found unpersuasive both of the factors considered by the *Hospital* Court of Appeals. First, the Supreme Court found that "the fact that an effect on interstate commerce might be termed 'indirect' because the conduct producing it is not 'purposely directed' toward interstate commerce does not lead to the conclusion that the conduct at issue is outside the scope of the Sherman Act." 425 U.S. at 744, 96 S.Ct. at 1852.[21] Second, and more important for present purposes, the Court found that an adverse impact on out-of-state businesses or on market price need not be shown: "since in this case the allegations fairly claim that the alleged conspiracy, to the extent it is successful, will place 'unreasonable burdens on the free and uninterrupted flow' of interstate commerce, they are wholly adequate to state a claim." *Id.* The Court concluded that the "combination of factors" described above (*i. e.*, the decrease in prospective purchases of out-of-state goods; the decrease in prospective revenues from out-of-state insurance companies; and the prevention of the proposed expansion, which would require out-of-state financing) would be "certainly sufficient" to satisfy the "affecting commerce" test.

▪ *A fortiori*, we regard the same result as mandated here. The amount of out-of-state purchases made by Hempfield—$400,-

**20.** *See* footnote 7 *supra.*

**21.** In reaching this conclusion, the Supreme Court discussed *Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).

000—far exceeds the $112,000 which the Supreme Court held to be sufficient for jurisdictional purposes in *Hospital*. Further, the record reflects that the pricing policy attacked by the plaintiff was a standard feature in Kresge's nationwide licensing agreements governing K-Mart food stores, which by 1971 numbered in excess of 300. This pricing policy, when considered with the amount of the plaintiff's out-of-state purchases, in our view more than meets the jurisdictional threshold established in *Hospital*.[22] Our review of this record in light of *Hospital* therefore, convinces us that the district court erred in granting summary judgment for Kresge on the basis of a lack of subject matter jurisdiction.[23] Having concluded that there is jurisdiction, we turn to the merits of plaintiff's complaint.

### III.

Hempfield contends that the pricing and product restrictions imposed by Kresge are illegal *per se* within the contemplation of the Sherman Act. Kresge, on the other hand, disputes the illegality of its admitted restrictions, claiming that these restrictions must be tested by the rule of reason and, when so measured, must be found to be reasonable and therefore, permissible.

In its recent discussion of these concepts in *United States v. Topco Associates,* 405 U.S. 596, 606–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1971), the Supreme Court said:

> On its face, § 1 of the Sherman Act appears to bar any combination of entrepreneurs so long as it is "in restraint of trade." Theoretically, all manufacturers, distributors, merchants, sellers, and buyers could be considered as potential competitors of each other. Were § 1 to be read in the narrowest possible way, any commercial contract could be deemed to violate it. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238 [38 S.Ct. 242, 62 L.Ed. 683] (1918) (Brandeis, J.). The history underlying the formulation of the antitrust laws led this Court to conclude, however, that Congress did not intend to prohibit all contracts, nor even all contracts that might in some insignificant degree or attenuated sense restrain trade or competition. In lieu of the narrowest possible reading of § 1, the Court adopted a "rule of reason" analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act. *Standard Oil Co. v. United States,* 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619] (1911). An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption. *Chicago Board of Trade v. United States, supra,* [246 U.S.] at 238 [38 S.Ct. at 243].

While the Court has utilized the "rule of reason" in evaluating the legality of most restraints alleged to be violative of the Sherman Act, it has also developed the doctrine that certain business relationships are *per se* violations of the Act without regard to a consideration of their reasonableness. In *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), Mr. Justice Black explained the appropriateness of, and the need for, *per se* rules:

> "[T]here are certain agreements or practices which because of their perni-

---

**22.** Our disposition of the jurisdictional issue presented here moots any need for us to discuss the discovery issue raised on appeal by the plaintiff. Our reading of plaintiff's brief as respects this issue reveals that plaintiff's desire for additional discovery was limited to establishing jurisdiction by virtue of Kresge's nationwide operations. *See* Brief for Appellant at 37–42. As stated, our conclusion that jurisdiction is present obviates any need to treat with this discovery issue.

**23.** We recognize that the district court did not have the benefit of the Supreme Court's discussion in *Hospital* at the time it decided the jurisdictional issue. Had that opinion been available, the district court might well have concluded that jurisdiction existed.

Having determined that jurisdiction is present, we need not discuss the propriety of summary judgment in the context of a jurisdictional dispute in an antitrust case. *See* the district court opinion, 394 F.2d at 830–32.

cious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken."

It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act. *See generally* Van Cise, The Future of Per Se in Antitrust Law, 50 Va.L.Rev. 1165 (1964). One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a

> "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, *e. g.,* manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that "[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition."

*Topco, supra,* 405 U.S. at 608, 92 S.Ct. at 1133.

■ Thus, before we can accept the *per se* argument urged upon us by the plaintiff here, we must analyze the business relationship between Hempfield and Kresge to determine: (1) whether it is one with which the courts have had "considerable experi-

ence", and (2) whether the challenged restrictions are "naked restraints of trade with no purpose except [the] stifling of competition."

### A.

At the outset, we observe that neither plaintiff nor defendant has brought to our attention any precedent or authority whereby the courts have evaluated in an antitrust context a business arrangement similar to the one established by the parties' agreements here. Nor has our independent research disclosed any legal or judicial antitrust analysis treating with this type of economic relationship.

The district court in its analysis of the parties' relationship believed that it resembled a franchise. The district court said:

> We believe that the analogy between the present agreements and franchise arrangements is further strengthened by the facts surrounding the initiation of the Hempfield-Kresge relationship as well as many provisions in the agreements including, *inter alia,* (1) Hempfield agreed that upon termination of the license agreements it would discontinue all use of the K-Mart or any related name; (2) Hempfield agreed to pay Kresge license fees as a percentage of gross sales in excess of a specified figure; (3) the parties agreed to a common advertising arrangement to be directed by Kresge, the cost of which was to be shared by Hempfield; and (4) there was an ongoing commercial relationship between the parties not only as to license fees and advertising but also as to other areas of operation.

394 F.Supp. at 844.

■ On the other hand, while we do not dispute that elements of a franchise may be found in the arrangement made between Kresge and Hempfield, we also recognize characteristics in that arrangement which are commonly identified with trademark licensing (*i. e.,* Hempfield was permitted to use and to "trade under" the K-Mart insignia.) [24] In addition, to the extent that

---

**24.** We appreciate that a trademark license may not be used to avoid Sherman Act liability.

*See United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *Timken*

Kresge and Hempfield offered like products for sale and competed "as one" with other establishments, the two acted as "partners" in establishing and operating under joint merchandising and pricing policies.

Finally, if it was indeed necessary (which we do not think it is) to attribute a definitive label to the relationship created by the Kresge-Hempfield agreements, in our opinion that relationship would most aptly be characterized as a "concession". Hempfield, by operating under the K-Mart name and appearing as "K-Mart" to third parties in effect operated its own "concession" within the K-Mart complex.

■ For our purposes here, there is no necessity to fit this relationship into any one business category. Our only inquiry is whether there has been sufficient judicial examination of, and experience with, the hybrid business arrangement at issue here. We are satisfied that this kind of business arrangement has yet to be exposed to judicial review. Just as the Supreme Court required more knowledge of actual impact on competition in *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), we too "need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack . . . any redeeming virtue' and therefore should be classified as *per se* violations of the Sherman Act." [25] Accordingly, under the circumstances presented here, we cannot subsume the challenged restraints to *per se* treatment.

We turn, then, to the second step of our analysis of these restrictions' susceptibility to *per se* treatment. This requires a consideration of the restraints themselves to determine if they produce the "pernicious effect on competition" and exhibit the "lack of redeeming virtue," *Northern Pacific, su-*

*pra*, that would require them to be deemed unreasonable.

## B.

■ The restraints normally found within the *per se* category are horizontal [26] limitations constituting "naked restraints of trade with no purpose except stifling of competition." *Topco, supra*, 405 U.S. at 608, 92 S.Ct. at 1133. Horizontal restraints by definition require agreements between competitors.

However, before we may say that . . . agreements [imposing such restraints] are inherently unlawful, we must find that the agreements were made between competitors, actual or potential, dealing in competing products in a relevant market.

*United States v. Columbia Pictures Corp.*, 169 F.Supp. 888, 893 (S.D.N.Y.1961). Without such competition, the necessary precondition to a § 1 violation is missing. Even if the license provisions challenged by the plaintiff were in the form of and had the substance of "naked restraints of trade," there would still be the need for such restraints to be imposed upon *competitors* for *no* purpose other than that of stifling competition.

■ Here, the relationship established by the parties demonstrates to our satisfaction that the necessary element of competition is lacking. The district court was similarly satisfied, stating as follows:

We find that Hempfield and Kresge were not competitors. In the first place, the Kresge department stores and the Hempfield grocery supermarkets were designed to sell entirely different kinds of merchandise. That was the reason for the agreements. The fact that somewhere between 2% and 5% of merchandise sold by Hempfield was also sold by defendant's stores does not, in our view, require a finding that Hempfield and

---

*Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

**25.** *Id.* at 263, 83 S.Ct. at 702 (citation omitted.)

**26.** We recognize that while vertical restraints do not normally fall within the *per se* rule, in

some instances, such as resale price maintenance, they may be conclusively presumed to be illegal. Here, however, no one contends that the agreements or practices constitute vertical restraints or that they would be so proscribed.

Kresge were competitors. On the contrary we believe it shows they were not. Therefore, a holding that Hempfield and Kresge competed would ignore the intensely practical business realities which underlie the antitrust laws.

In his affidavit, Frank Zapalla, one of the Hempfield incorporators, states:

"It was never our intention, or Kresge's, that in any sense we were to be competitors of each other, for under the arrangement, we were both to be selling under one roof and under the name of K-Mart entirely different kinds of merchandise."

394 F.Supp. at 847.

We grant that certain non-food items were offered for sale by both Kresge and Hempfield. On the surface, this might appear to indicate that the parties were competitors in that the proceeds of each sale went into the pocket of *either* seller Kresge *or* seller Hempfield. As we view the substance of the transaction, however, both Kresge and Hempfield presented a common front under a common name to the customer. Therefore, whether the non-food item was purchased from Kresge or from Hempfield, it was as if that item had been offered for sale by Kresge alone, but at two different locations in its K-Mart establishment.[27] Here, the fact of noncompetition is dictated by the practical business arrangement of the parties, and indeed is disclosed as their intent by uncontradicted affidavit.[28] If for no other reason than the absence of this necessary element of "competitors", a horizontal limitation cannot be made out.

Moreover, the challenged restraint enabled Kresge to add a food component to its discount operation without causing customer confusion or threatening the low-price "K-Mart" discounting image upon which the success of K-Mart (including K-Mart Food) would depend. Therefore, far from attempting to stifle competition, the restrains had as their purpose the stimulation of business and efficiency for both the department store and the supermarket: they (the restraints) would assure that the overall operation would compete effectively in both the discount and food markets vis-a-vis other department store and food discounters. The restraints thus serve a legitimate business purpose.[29]

We therefore conclude that the challenged restraints are not illegal *per se.*

### IV.

■ Our treatment of the restraints under the rule of reason requires less discussion. Hempfield, as the plaintiff in this action, bore the burden of proof to establish that the licenses, restraints and business arrangements violated Section 1. *Shawver & Son, Inc. v. Oklahoma Gas & Electric Co.,* 463 F.2d 204, 205–06 (10th Cir. 1972); *Venzie Corp. v. U. S. Mineral Products Co.,* 382 F.Supp. 939, 950–51 (E.D.Pa.1974), *aff'd,* 521 F.2d 1309 (3d Cir. 1975); *Alders v. AFA Corporation of Florida,* 353 F.Supp. 654, 657–58 (S.D.Fla.1973), *aff'd,* 490 F.2d 990 (5th Cir. 1974). *See also Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 849 (5th Cir. 1975). Hempfield has only marshalled arguments contending that the restraints that it finds

---

27. The problem of customer confusion and possible ill will that would follow if different prices were charged for the same product offered at different locations in "one" store was foreseen and guarded against by the parties. *See* Affidavit of Frank Zapalla, App. at 401a–410a.

28. *See id.* The need for unified business conduct under a concession arrangement is discussed in *Jay Bee Apparel Stores, Inc. v. 563–565 Main St. Realty Corp.,* 130 Misc. 23, 223 N.Y.S. 537 (S.Ct. 1927), *aff'd* 226 App.Div. 721, 233 N.Y.S. 792 (4th Dep't 1929), albeit not in an antitrust context.

29. As the district court noted:

A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal per se. *United States v. Columbia Steel Co.,* 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533 (1948).

394 F.Supp. at 843.

offensive are subject to the *per se* rule, *see* Brief for Appellant at 14 *et seq.* It has failed to address itself to the issue of the restraints' legality under the rule of reason.[30]

The test under the rule of reason has been set out by this Court as follows:

Despite the years since its pronouncement, *Chicago Board of Trade v. United States* remains the crucible for assaying the legality of a restraint under section 1. There, Justice Brandeis explained the sort of scrutiny that is required before a trial court may determine that a restraint of trade, not *per se* illegal, exceeds the bounds permissible under the rule of reason:

Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
[246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)].

*American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1246–47 (3d Cir. 1975).

As noted, plaintiff has the burden of proving a Section 1 violation under the rule of reason.

■ In an attempt to expedite final determination of the case, the district court, after ruling on jurisdiction, went on to discuss the merits of the case.[31] In addressing the merits, the district court observed that "both parties agree that there are no issues of material fact precluding summary judgment." 394 F.Supp. at 843. Our examination of the record and the absence of any contention to the contrary by the parties[32] supports the district court's conclusion. Looking to the record, therefore, we find no evidence that could lead us to conclude that the restraints here imposed are "such as may suppress or even destroy competition." To the contrary, the only proofs in this record lead to the opposite conclusion. The uncontradicted affidavit of Frank Zapalla, who as one of the founders of Hempfield's predecessor had negotiated the Kresge license, reveals the following facts about the parties' relationship, the nature of the restraints, and their impact and purpose:

6. . . . I became aware that Kresge was interested in licensing food operators to use the K mart name for food supermarkets operated in conjunction with, but by management independent from, K mart discount variety stores. Kresge wanted the supermarket operated with the "discount" image of high volume and competitive prices. This concept appealed to Mr. Skatell and myself because such a common program would be mutually advantageous to both Kresge's department store and the food supermarket. We felt this would be particularly advantageous to the food supermarket because it would have the benefit of identification with the K mart name, its heavy advertising, and the additional flow of shoppers generated by K mart.

. . . . .

30. Apparently the plaintiff did not press this issue before the district court, relying, as it does here, on the *per se* theory.

31. *See* note 4 *supra.*

32. As noted previously, plaintiff's desire for further discovery was directed solely to the jurisdictional issue. *See* note 22 *supra.*

8. I reviewed the Kresge license agreement myself, and with Mr. Skatell. It contained limitations as to non-food items, both as to types of items and percentage of total area. We were interested in selling foods, and had no desire to compete with Kresge, or any other non-food stores in the shopping center, on non-food items and this limitation seemed completely reasonable to us. In addition, Greensburg Plaza, Inc. had a percentage lease with Kresge so any competition with the Kresge discount department store by the supermarket would have been self defeating.

9. It was never our intention, or Kresge's, that in any sense we were to be competitors of each other, for under the arrangement, we were both to be selling under one roof and under the same K mart name entirely different kinds of merchandise. Each was to complement the other. However, we both did realize that there would have to be some overlap, since traditionally, it was customary for food supermarkets to sell some non-food items. Kresge had a provision that to the extent some goods would be sold in both stores, (a very small percentage of the food store inventory, mostly health and beauty aids—perhaps 5% at most), they would be sold at the same price. Once again, this was completely agreeable to us because we did not want to compete with another store using the K mart name. We intend to have the same type of low-price discount operation as to foods that Kresge had for variety items—so there was no conflict. We also realized that it would be to our mutual advantage to coordinate our prices of any items sold in common between the two stores to avoid customer confusion and to avoid damage to the K mart discount image.

10. All of the items sold in common were traditional national brand name or other private label products that were freely available to the public at competitive prices in other stores throughout the marketing area served by our stores. We bought none of these products from S. S. Kresge Company or any of its subsidiaries—and we were free to purchase them from any source we wished.

11. As to the "identical items" carried by both the discount department store and our own food supermarket, we were perfectly willing to follow the Kresge pricing pattern on a regular basis. We bought our health and beauty aids from a jobber also serviced by Fox Grocery, who would pre-price them and stock on our shelves. Our plan was for the jobber to check the K mart discount department store pricing and follow it.

12. On promotional items and advertised sales, the managers of each store were supposed to alert each other and the item being promoted would be removed from inventory during the special promotion. This was done to maintain the constant image of single, unitized ownership, and value.

. . . . .

17. I agreed to this language[33] because it essentially accomplished one purpose of two separate operations under one name, and the identical pricing would avoid customer confusion and damage to the low price-discount image that we were both trying to accomplish.

. . . . .

19. On entering into the two agreements referred to above with the Kresge Company, including the clauses on restriction of items and identical pricing on like items, we did so without any coercion or economic pressure from Kresge. As

---

**33.** The language in question read:

On non-exclusive, non-food items permitted in licensee's assortment and also carried by Licensor, Licensor and Licensee will maintain identical competitive prices which have been mutually established. On special sales on promotion of any of these goods by either Licensee or Licensor the offered price is to be met or the goods removed for sale for the duration of the promotion. Licensor and Licensee shall provide each other with sufficient and advance information to provide for a coordinated operation.

¶ 16, App. at 407a.

indicated earlier, we felt they were to our advantage as well as Kresge's.

App. at 402a–08a.

In view of these, the only "relevant facts", we have no hesitation in concluding, as did the district court, that the challenged restraints "merely regulates and perhaps thereby promotes competition."[34] Certainly, these restraints—incidental and peculiar to this distinctive business relationship, adopted by the parties for the purposes described above, and designed only for the operation of a more efficient unified competitive entity vis-a-vis others—cannot be said to either "suppress" or "destroy" competition.[35] We hold, therefore, that on this record, the plaintiff has not proved that the restraints offended Section 1 of the Sherman Act.

### V.

We have concluded that summary judgment predicated on a lack of subject-matter jurisdiction should not have been granted. Having thus resolved the jurisdictional issue favorably to plaintiff, Hempfield's discovery claim has thereby been mooted.[36]

However, our analysis of the merits comports with the conclusions expressed by the district court in that we have found no basis for holding that the challenged restraints are illegal *per se*. Further, the record will not support a holding of Section 1 illegality under the rule of reason.

We will therefore affirm the district court's grant of summary judgment in favor of Kresge, not on the ground[37] that jurisdiction is lacking, but on the ground that no Sherman Act violation has been proved.

---

34. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

35. *See id. See also* 8 Von Kalinowski, Antitrust Laws and Trade Regulation § 59.06[3] (1972), 1 Callman, Unfair Competition, Trade-

marks and Monopolies § 15.5.3, at 465 (3d ed. 1967).

36. *See* notes 22, 32 *supra*.

37. *See* note 4 *supra*.