**John N. ROBINSON, Plaintiff,**

v.

**George J. MAGOVERN, Cardiothoracic Surgical Associates, Inc., Allegheny General Hospital, and Henry G. Allyn, Jr., Gay E. Bodick, Fred Brand, Jr., Henry Chalfant, Ronald R. Davenport, Harry Edelman, III, Harry M. Epstein, William H. Genge, W. R. Krome George, R. Burt Gookin, Thomas C. Graham, Kenneth C. Hewitt, John A. Huffman, Jr., B. F. Jones, III, Bernard H. Jones, Caryl M. Kline, Richard K. Means, Francis B. Nimick, David B. Oliver, II, Robert B. Pease, G. Harton Singer, III, Elizabeth A. Smith, W. P. Snyder, III, Leonard A. Swanson, W. Bruce Thomas and Paul H. Weyrauch, Individually and as Trustees of Allegheny General Hospital, Defendants.**

**Civ. A. No. 77–75.**

United States District Court, W. D. Pennsylvania.

Sept. 12, 1978.

Roslyn Litman and John E. Grasberger, Litman, Litman, Harris & Spector, Pittsburgh, Pa., for plaintiff.

Judd N. Poffinberger, Jr., and David L. McClenahan, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for defendants Allegheny General and its Trustees.

David B. Buerger and Robert Frantz, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendants Magovern and Cardiothoracic Associates.

## OPINION

SNYDER, District Judge.

Suit was brought by Dr. John N. Robinson for denial of staff privileges against Dr. George J. Magovern, Director of the Department of Surgery and Chief of Thoracic Surgery at Allegheny General Hospital; Cardiothoracic Surgical Associates, Inc. (CTSA), a professional corporation of physicians specializing in cardiothoracic surgery; Allegheny General Hospital (AGH) and its Trustees, individually and as Trustees. Dr. Robinson alleges:

1. Anti-trust violations of Sections 1 and 2 of the Sherman Act 15 U.S.C. §§ 1 and 2 (Count I), alleging agreement that only CTSA members would receive staff privileges at AGH;

2. Violations of the Fifth and Fourteenth Amendments of the United States Constitution and Section 1983 of Title 42, United States Code, with jurisdiction conferred by Section 1343 and Section 1331 of Title 28, United States Code (Count II), alleging a denial of equal protection;

3. A third party beneficiary right of action for failure to comply with the provisions of the Medicare Act requiring compliance with regulations promulgated by the Secretary of Health, Education and Welfare, 42 U.S.C. § 1395 (Count III);

4. A pendent state breach of contract claim (Count IV);

5. A pendent state claim for tortious interference with Dr. Robinson's right to freely practice his profession, with damage to his reputation (Count V); and

6. A pendent state claim of conspiracy in restraint of trade in violation of state law (Count VI).

Defendants Magovern and CTSA filed Motions for Summary Judgment and Defendants AGH and its Trustees filed Motions to Dismiss supported by affidavits, which will be treated as Motions for Summary Judgment. Interrogatories were propounded and answered, depositions were taken, and briefs received. After consideration of all the record and argument thereon, the Motions will be granted in part and denied in part.

## I. THE FACTUAL ALLEGATIONS

According to Plaintiff, he was denied staff privileges at AGH as a result of an agreement between Dr. Magovern, CTSA, AGH and its Trustees to preclude the Doctor, and all other cardiothoracic surgeons not associated with CTSA, from obtaining staff privileges. Dr. Robinson is a skilled cardiothoracic surgeon with extensive educational qualifications and is certified by

the American Board of Surgery and the American Board of Thoracic Surgery. He submitted an application for membership on AGH's Medical Staff and was required to meet with Dr. Magovern, the "senior" of CTSA, who had a financial interest, as did CTSA, in not encouraging Dr. Robinson or any other thoracic surgeon who was not associated with CTSA to apply. Dr. Magovern attempted to discourage Dr. Robinson by informing him without basis that a condition precedent was appointment to the University of Pittsburgh School of Medicine and/or to the Staff of Presbyterian University Hospital.[1]

Thereafter, with the assistance of counsel, Dr. Robinson obtained and submitted an application for membership to the AGH Medical Staff. Dr. Magovern reviewed the application and, without cause, recommended denial of the application to the Credentials Committee of the Medical Staff. Subsequently, the Credentials Committee recommended that Dr. Robinson's application be denied. After a hearing held in accordance with the Medical Staff By-Laws, the Executive Committee of the Medical Staff recommended to AGH's Board of Trustees that Dr. Robinson's application be denied. The Board of Trustees declined to appoint Dr. Robinson to the Medical Staff. All actions were based on Dr. Magovern's negative recommendation.

The Defendants join in their Motions for Summary Judgment contending with respect to the first three counts of the Complaint:

Count 1. That no proper action has been set forth for relief under the anti-trust laws.

Count 2. That no "state action" has been set forth as a basis for civil rights relief.

Count 3. That Dr. Robinson has no third party cause of action arising from any agreement between AGH and an agency of the federal government.

As to the last three pendent counts, Counts IV through VI, the Defendants contend that when the first three counts are dismissed, the last three must also be dismissed for there are no independent grounds for federal jurisdiction.

Dr. Robinson contends as to Count I, that "Dr. Magovern's veto meant that [Dr. Robinson's] application was *de facto* rejected. True, the veto was followed by some procedural window dressing, including a hearing, but for all intents and purposes his application had not the slightest chance of being approved . . . . AGH is a closed shop. Dr. Magovern knows it and the Hospital knows it. Become a member of CTSA, and AGH staff membership is assured." (Plaintiff's Brief at 12–13)

All of this, says Dr. Robinson, is a *per se* anti-trust violation as a group boycott (i. e., concerted refusal to deal) or an unreasonable restraint of trade, and the agreement between AGH and CTSA is a reciprocal dealing agreement of referral to each other when cardiothoracic surgical procedures are indicated.

As to Count II, Dr. Robinson contends that AGH was acting as an arm of the state because of state involvement in AGH and that he was rejected because he was an economic threat to Dr. Magovern and CTSA, so that he was never afforded due process on his application when he was refused because he was not a CTSA member, and that he was treated differently and denied equal protection of the laws.

As to Count III, Dr. Robinson sets forth that the Medicare Program requires selection of medical staff on defined criteria, including that applicants be judged on "definite workable standards", 20 C.F.R. § 405.-1023(e)(1). Having failed to comply, although having accepted medical benefits, AGH has breached its contract with the Social Security Administration (SSA), and Dr. Robinson seeks as third party beneficiary to enforce the conditions stipulated by the SSA.

1. Investigation revealed that a CTSA member had been appointed to AGH's Medical Staff without such prior appointment.

## II. THE APPLICABLE STANDARD

We are guided in our considerations by certain well recognized principles. All parties have submitted depositions and affidavits in support of their contentions; thus the Motions to Dismiss must be treated as Motions for Summary Judgment and disposed of in accordance with Rule 56 of the Federal Rules of Civil Procedure. We are concerned, then, with whether any real and genuine issues of material fact exist as to the questions raised by the Motions or whether the movant is entitled to judgment as a matter of law. *See United States v. Employing Plasterers Assn.*, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954) and *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). The existence of difficult or complicated questions of law without genuine issues of material fact does not bar a summary judgment, 6 Moore's *Federal Practice* ¶ 56.16 at p. 2447; *Evans v. S.S. Kresge Co.*, 394 F.Supp. 817, 832 (W.D.Pa.1975), aff'd 544 F.2d 1184 (3rd Cir. 1976), *cert. den.* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). However, we must recognize the admonition that summary proceedings are used sparingly in complex anti-trust cases, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and that all evidence and inferences drawn therefrom must be considered in a light most favorable to the party opposing the summary judgment. *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3rd Cir. 1972); *Long v. Parker*, 390 F.2d 816, 821 (3rd Cir. 1968), *vacated on other grounds* 384 U.S. 32, 86 S.Ct. 1285, 16 L.Ed.2d 333 (1966). We will discuss the issues raised above *seriatim* in light of these principles.

## III. THE ANTI–TRUST CONTENTIONS

### A. *Activities In Interstate Commerce*

It is acknowledged that as to Count I, the anti-trust violations, there must be alleged either (1) activities that are in the flow of interstate commerce, or (2) activities which although occurring purely on a local level substantially affect interstate commerce. *Rasmussen v. American Dairy Association*, 472 F.2d 517, 522 (9th Cir.), *cert. den.* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973); *Las Vegas Merchant Plumbers Association v. United States*, 210 F.2d 732, 739, n.3 (9th Cir.), *cert. den.* 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645, *reh. den.* 348 U.S. 889, 75 S.Ct. 202, 99 L.Ed. 698 (1954). Dr. Robinson asserts that the Complaint and supporting material here establish both criteria, i. e., that the Defendants' activities are in interstate commerce and substantially affect it as well.

Dr. Robinson points to allegations in Paragraph 27 that the effect of the boycott in interstate commerce "was and is to set, establish, or control the price of cardiothoracic surgical services at AGH." Plaintiff's Affidavits show that in 1976, CTSA received $227,258.90 from Medicare, of which approximately $68,000.00 was from out-of-state third party payers, and it is alleged that in 1975–76 alone over one-half million dollars of price-fixed fees at AGH crossed state lines. Further, 100% of Medicare and 49% of Medicaid funds originate with the federal government in Washington, D.C., and Plaintiff alleges the flow of such funds has been affected by AGH's refusal to allow Dr. Robinson to treat his patients there. In the years 1975–76, CTSA received $430,-000.00 in Medicare payments alone. Dr. Robinson points to AGH's capital purchases of equipment for use in surgery, having a useful life of more than two years, of over $87,000.00 and claims that decisions relating to such purchases as affected by the AGH/CTSA agreement would have an effect on interstate commerce.

In *Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48, 51 (3rd Cir. 1973), our Circuit held that when a hospitalization insurer and a planning agency used illegal means to regulate competition in hospital services in the area, the necessary effect was to close down plaintiff hospital and to close down or limit the operations of other hospitals, and where the plaintiff hospital made purchases in excess of $200,000.00 from other companies located outside the state each year, there was an effect on interstate commerce so as to give federal

court jurisdiction in a Sherman anti-trust action. The Circuit pointed to two Supreme Court cases, *Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967) (per curiam) (a division of markets by liquor wholesalers operating entirely within Oklahoma) and *United States v. Employing Plasters Assn., supra,* (control of competition in Chicago's plastering business), which dealt with alleged conspiracies directed toward controlling purely intrastate markets for goods and services. In these cases it was shown that there was no discussion of "directness" or of the specific relationship between the interstate goods affected and the local market controlled. Nor was there concern over the specific magnitude of the impact on interstate commerce caused by the alleged conspiracy. Instead, the Court looked to satisfy itself that the logical, and therefore probable, effect of the alleged illegal acts was to reduce the flow of goods in interstate commerce, as Dr. Robinson claims resulted here in reducing surgeons at AGH.

In the matter *sub judice,* there is alleged a course of conduct which purportedly sought overall control of a local competitive market (i. e., the availability of cardiothoracic services and the anti-competitive effect of exclusion of non-CTSA members). As in *Doctors, Inc. v. Blue Cross of Greater Philadelphia, supra,* there is an alleged conspiracy aimed at a market which limits not only the competition from Dr. Robinson, but whose effects could transcend those relating to his services alone. Plaintiff has therefore presented a genuine dispute of material fact concerning the effect of Defendants' conduct on interstate commerce, and must be given the opportunity to prove at trial that such a substantial effect resulted.

B. *The Conspiracy In Restraint Of Trade*

In Paragraphs 10 through 21 of the Complaint, Dr. Robinson alleges a conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act. Defendants concede for the purposes of argument, as the Complaint alleges, that Dr. Magovern rejected the application of Dr. Robinson to "preserve, protect and perpetuate control" of cardiothoracic surgery at AGH. They contend, however, that the charges are only that AGH refused the application because of agreement with Dr. Magovern that he should "perpetuate control" over this branch of surgery. They then cite *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. den.* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), which held that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B, and that such transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A. The Defendants further cite *Ark Dental Supply Co. v. Cavitron Corporation,* 461 F.2d 1093 (3rd Cir. 1972), holding to the same effect.

Dr. Robinson, however, asserts that the Court concluded in *Seagram* that there was no evidence that Seagram or Barton had any *anti-competitive motive* for terminating the plaintiff as their distributor, and there were no price fixing or other similar motives, demands, or activities involved. The Court also agreed "that 'combination or conspiracy' to establish a common distributor could be shown to have such an adverse purpose or effect on competition that it would violate Section 1 of the Sherman Act as an unreasonable restraint of trade." (416 F.2d at 78). In this case, the Plaintiff has alleged that the Defendants' refusal to deal was anti-competitive in purpose and effect, and thus is not within the rule of the *Seagram* case. Dr. Robinson also cites *De Filippo v. Ford Motor Co.,* 516 F.2d 1313, 1318 (3rd Cir.), *cert. den.* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975), in which Judge Aldisert stated:

> "From all this we are able to conclude that a concerted activity constitutes a 'group boycott' and is considered *per se* 'in restraint of trade' when 'there [is] a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both.'"

*See also, Burdett Sound, Inc. v. Altec Corporation*, 515 F.2d 1245, 1248 (5th Cir. 1975) ("A refusal to deal becomes illegal under the Sherman Act only when it produces an unreasonable restraint of trade, such as price-fixing, elimination of competition, or creation of monopoly").

 The so-called *Colgate* Doctrine (*United States v. Colgate & Company*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)) that a company has a right to refuse to deal with whomever it pleases, is not applicable where the refusal to deal is anti-competitive in purpose or effect, or both, or is in restraint of trade. The issues then become: (1) whether the Defendants refused to deal, and (2) if so, whether their refusal was a product of anti-competitive motive. *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296 (9th Cir. 1978), 1978 Trade Cases ¶ 61,886 at 73,713. The anti-competitive motive and unreasonable restraint of trade are in dispute, and summary judgment must be denied on this basis.[2]

### C. The Relevant Market

Dr. Robinson and the Defendants agree that he must establish the relevant *product* market and the relevant *geographic* market. There seems little dispute that the product in this case is cardiothoracic surgery, which appears to encompass all surgery performed on the thorax, including pulmonary, esophageal, mediastinal and open heart surgery. The relevant geographic market contended for by the Plaintiff is Allegheny General Hospital, or in the alternative "Allegheny Northwest". The Defendants contend that the record is barren of any data to support either assertion and that, on the contrary, the record demonstrates quite clearly that the relevant geographic market is, at a minimum, Allegheny County, where no monopoly exists.

Under the definition of *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the relevant geographic market is the geographical area in which the buyer has, or in the absence of monopoly would have, a real choice as to price and alternative facilities. Under the evidence before the Court at this time, there would be a question of fact which could not be resolved on these Motions for Summary Judgment. The Defendants contend they have shown through the 1974 Planning and Development Prospectus attached to the Affidavit of Harold DeSanders that AGH was perceived as a regional referral teaching hospital and therefore in service to a region largely contingent upon "the competitive quality of its diagnostic and treatment clinical specialties, as judged over time, by the referring primary physician, who seeks optimal resolution of a patient's health problem."

Dr. Robinson, to the contrary, alleges that Dr. Magovern has the power to exclude competition and fixes the price of cardiothoracic surgical services at AGH, and therefore this one institution may constitute a relevant geographic market. Citing *Gamco, Inc. v. Providence Fruit Market & Produce Building*, 194 F.2d 484 (1st Cir.), *cert. den.* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1953) (where one building constituted a relevant geographic market) and *Woods Exploration & Producing Co. v. Aluminum Company of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. den.* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (where one natural gas field was held to be a relevant geographic market for purposes of determining monopoly power.) It is noted that the Health Systems Agency of Southwestern Pennsylvania (HSA) is the designated agency for the Southwestern Pennsylvania area and has set the "Allegheny North-

---

**2.** Despite our holding, Plaintiff does not necessarily have "standing" to claim damages for price-fixing, as is implied in Paragraph 27 of the Complaint. Even if he can show that Defendants' conduct was an unreasonable restraint of trade, which, in turn, affected the price of cardiothoracic surgery, this does not mean that these higher prices were the proxi-

mate cause of any injury to his "business or property". 15 U.S.C. § 15. *See generally: Bogus v. American Speech and Hearing Association*, 582 F.2d 277 (3rd Cir. 1978); *Bogosian v. Gulf Oil Corporation*, 561 F.2d 434 (3rd Cir. 1977), *cert. den.* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

west" sub-area for hospital services planning purposes. Included in this area are seven hospitals for the delivery of health care services for purposes of matters such as bed inventories and population projection, and its Preliminary Health Systems Plan for Southwestern Pennsylvania for January 1978 recommends that (Plaintiff's Brief at 42):

> "Allegheny General Hospital . . . should assume a leadership role in the development of strong referral relationships among northwest Allegheny County hospitals . . . ."

Dr. Robinson also points out that the 1974 Prospectus of the Allegheny Hospital Corporation was "formed to administer more complete health care to the citizens of the Northwest section of Allegheny County." Plaintiff states AGH is the only hospital providing cardiothoracic surgical services in that "Allegheny Northwest" market. We are well aware, as pointed out by the Defendants, that there are ten toll free bridges in the immediate vicinity of AGH, and that there are five other hospitals within three and a half miles which maintain active surgical services. These, however, raise only issues of fact not to be decided on Motions for Summary Judgment. With the evidence available, there is a question of fact as to the relevant geographic market which cannot be determined on these Motions.

### D. Conclusory Allegations

We must also deal with the argument of the Defendants that there is only a conclusory assertion by Dr. Robinson that AGH's refusal to deal with him evidences and constitutes "a conspiracy to monopolize the field of cardiothoracic surgical services in violation of Section 2 of the Sherman Act" (Complaint, ¶ 30). The Defendants insist that to show a conspiracy to monopolize, Dr. Robinson must show a specific intent to monopolize plus "a dangerous probability of achieving monopolization in a relevant market". See Rea v. Ford Motor Co., 497 F.2d 577, 590, n.28 (3rd Cir.), cert. den. 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). They urge that about 22% of the cardiotho-

racic surgery performed in Allegheny County is done at AGH and that this is obviously insufficient to enable a control of price or to exclude competitors. Here again, however, the application of statistics depends upon the determination of "relevant market", which must be made at trial.

## IV. THE CONSTITUTIONAL AND CIVIL RIGHTS CLAIMS

In Paragraphs 32 through 44 of the Complaint, Dr. Robinson asserts that his failure to be appointed to AGH's staff deprived him of due process and equal protection of the laws, and violated the Civil Rights Act of 1871. Plaintiff concedes that the basis for his claim must be that AGH's acts constituted "state action" and that AGH was acting "under color of state law".

In Hodge v. Paoli Memorial Hospital, 576 F.2d 563, 564 (3rd Cir. 1978) (per curiam), a panel of the Court consisting of Circuit Judges Hunter and Weis, and District Judge Cohen, aligned itself with the majority of the Courts of Appeals in holding that:

> "[T]he receipt of Hill-Burton construction funding, Medicare and Medicaid funds, and the existence of tax exemption, as well as the state licensing requirements for nonprofit hospitals, do not constitute state action under 42 U.S.C. § 1983."

Our Circuit further pointed out in Hodge, that the Fourth Circuit Court of Appeals had espoused a contrary view originating in Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), cert. den. 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964), and that that Court extended the principle to situations involving medical staff privileges. See e. g., Duffield v. Charleston Area Medical Center, Inc., 503 F.2d 512 (4th Cir. 1974). In holding with the majority, the panel went on to add: "We do not meet the situation in other cases where other considerations may merit a different approach." We find Hodge to be here controlling. Cf. Holton v. Crozer-Chester Medical Center, 560 F.2d 575 (3rd Cir. 1977) (where the Circuit returned to the District Court allegations of newly dis-

covered state action matters on remand for consideration of a motion by the plaintiffs to amend the complaint.) In *Holton* there was a new allegation that the Social Security Act mandated that the state must provide family planning services for certain Medicaid recipients and that the state may contract with private hospitals, such as Crozer, to provide those services on behalf of the state. Dr. Robinson submits that a different approach is mandated here because the quantity and quality of HEW ties with the state are substantially greater than those in *Paoli*, and additional ties with the state exist here. We cannot so find.

We begin our analysis under the strictures set forth in *Magill v. Avonworth Baseball Conference*, 516 F.2d 1328, 1331 (3rd Cir. 1975), where the Court identified three basic categories of state action cases:

"(1) where state courts enforced an agreement affecting private parties;

(2) where the state 'significantly' involved itself with the private party; and

(3) where there was private performance of a governmental function."

The first category does not apply here. As to the contention that the case belongs in the second category, we cannot find the government involvement as is required to render AGH's activities to be treated as the activity of the state itself. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Dr. Robinson claims here that the same lessor-lessee interdependent relationship is present that was present in *Burton*, where a restaurant housed in a parking structure built and maintained by public funds discriminated against Blacks, while here, in order to obtain funding through municipal bonds in 1974 and 1976, AGH leased the premises to the Allegheny County Housing Development Authority and the Authority then leased back the premises to AGH. The instant situation is distinguishable from *Burton*, for in this case the state obtains no

direct pecuniary benefit as was true there. Dr. Robinson also points out that the land owned by AGH was obtained from the Urban Redevelopment Authority of Pittsburgh pursuant to Redevelopment Area 18 Plan, and that there was an AGH covenant not to discriminate. Again, we do not find the government involved sufficiently to form the basis for state action.

The Plaintiff further alleges affiliation with the University of Pittsburgh and with the Pittsburgh Board of Education, and other state educational institutions, and various tax benefits enjoyed by AGH. None of these considerations lead to a contrary finding. Nor can we say a private hospital is of such a public nature that it is performing a governmental function so as to constitute state action. We must therefore find that there was no state action, and summary judgment must be entered for the Defendants as to Count II.

### V. THE FEDERAL CONTRACTUAL CLAIMS

■ Paragraphs 45 through 53 of the Complaint allege that AGH made a contract with the United States Government which AGH breached by failing to grant Dr. Robinson membership on its medical staff.

In the first place, it is obvious that Defendants Magovern and CTSA were not parties in any way to that contract, nor is there any claim that these Defendants breached any contract to which they were parties. Accordingly, Count III does not concern these Defendants.

As to AGH, Dr. Robinson points to a condition of participation in Medicare, set by federal regulation, that requires selection of hospital staff members be based upon written, defined, and definite and workable standards, 20 C.F.R. § 405.-1021(e)(1) and (3), and to the fact that the Joint Commission on Accreditation of Hospital Standards is the agency for approval of standards for capital expenditures in excess of $100,000.00 (for purposes of Social Security Administration reimbursement). Standard VII of these regulations, which

are applicable to hospital management, requires that:

> "The governing body through its chief executive officer shall take all reasonable steps to conform to all applicable laws and regulations."

And Standard IX requires that:

> "The governing body shall delegate to the medical staff the authority to evaluate the professional competence of staff members and applicants for staff privileges."

This has been interpreted to mean that:

> "no applicant shall be denied medical staff membership . . . on the basis of any . . . criteria lacking professional justification."

We do not find here, however, entitlement either to a third party beneficiary claim or to claims asserted on the ground that a private remedy is implicit in the particular statute. *Compare Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and *City of Inglewood v. City of Los Angeles,* 451 F.2d 948, 955 (9th Cir. 1972). Nor do we have the situation revealed in *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), where the plaintiff's physician was permitted to bring an action challenging the constitutionality of a Missouri statute excluding abortions as not "medically indicated", because the employment of the right was inextricably bound up with the activity the litigant wished to pursue.

In addition, we note that Paragraph 47 cites 42 U.S.C. § 1395 for the proposition that a hospital must abide by regulations promulgated by the Secretary of Health, Education and Welfare. But there is a provision within that Section to the effect that (42 U.S.C. § 1395):

> "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the adminis-

tration or operation of any such institution, agency, or person."

Therefore, summary judgment will be entered for the Defendants on the Federal Contractual Claims.

## VI. THE PENDENT CLAIMS

In Paragraphs 54 through 68, the Plaintiff makes various claims in which he invokes the jurisdiction of this Court as "ancillary and pendent" to claims of violations of the anti-trust laws.

In light of our conclusion above, it is sufficient in this matter to refer to *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), where the following appears (427 U.S. at 9, 96 S.Ct. at 2418, 49 L.Ed.2d at 283):

> "Thus, in a federal-question case, where the federal claim is of sufficient substance, and the factual relationship between 'that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case,"' pendent jurisdiction extends to the state claim."

Since we have here already concluded that there is federal question jurisdiction, the Motions for Summary Judgment on the pendent state claims must be denied.