**UNITED STATES of America, Plaintiff,**

**v.**

**COLUMBIA PICTURES INDUSTRIES, INC.; Getty Oil Company; MCA, Inc.; Paramount Pictures Corporation; and Twentieth Century-Fox Film Corporation, Defendants,**

**and**

**Premiere, Intervenor-Defendant.**

**80 Civ. 4438 (GLG).**

United States District Court, S. D. New York.

Dec. 31, 1980.

Seymour H. Dussman, Gordon B. Stoner, Karen Magid, Elisabeth P. Hyde, Stanley M. Gorinson, Robert E. Hauberg, Jr., U. S. Dept. of Justice, Antitrust Division, Washington, D. C., of counsel, for plaintiff.

Simpson, Thacher & Bartlett, New York City, for defendant, Paramount Pictures Corp.; Roy L. Reardon, Charles E. Koob, Nicholas M. Cannella, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant, Columbia Pictures Industries, Inc.; Ira Millstein, Alan J. Weinschel, Henry J. Tashman, New York City, of counsel.

Dechert, Price & Rhoads, Philadelphia, Pa., for defendant, Getty Oil Co.; H. Francis De Lone, Robert A. Cohen, Philadelphia, Pa., of counsel.

Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for defendant, MCA, Inc.; Allen E. Susman, William Billick, Beverly Hills, Cal., of counsel.

Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant, Twentieth Century-Fox Film Corp.; Julian O. Von Kalinowski, James Patrick Clark, Los Angeles, Cal., of counsel.

Munger, Tolles & Rickershauser, Los Angeles, Cal., for intervenor-defendant, Premiere; Ronald L. Olson, Jeffrey I. Weinberger, Harold A. Barza, Bradley S. Phillips, Los Angeles, Cal., of counsel.

## OPINION

GOETTEL, District Judge:

The culture of the United States during the twentieth century has been largely shaped by its motion pictures. Indeed, the images on the silver screen were so pervasive that much of the world has come to think of this country as it was portrayed in the movies. In the middle of the century, an interloper called television threatened the motion picture industry, but, after a period of retrenchment, Hollywood came back strongly, exhibiting its wares over the airwaves of its new competitor. The popularity of movies on television was well dem-

onstrated, but the question of how to realize royalties comparable to those obtained from theatrical licenses troubled the motion picture industry.

In the last quarter of this century, a new creature known as "pay television" appeared, through which direct revenues could be obtained from the showing of theatrical motion pictures, uncut and uninterrupted, on special television channels. The popularity of this medium has grown so rapidly that it is not impossible that, by the end of the century, it will be the prime method for viewing motion pictures. This case concerns who will reap the enormous revenues available from this enterprise.

### THE FACTS

*Cable Television*

Pay television is an outgrowth of cable television. The first cable systems were designed to transmit better signals from commercial television stations to homes in poor-reception areas such as rural communities far from broadcasting stations. Initially, this was done by the use of a tall community antenna, which picked up signals from nearby metropolitan areas and transmitted them to subscribers' sets over a coaxial cable. Later, programs were imported from commercial television stations well outside the community's normal viewing area. As these cable systems grew, they began to create some of their own programming for their subscribers.

Cable systems were also found to be a desirable method of transmitting television signals in metropolitan areas, where buildings and other obstructions caused reception problems. However, the cost of installation was so great in such areas that other sources of revenue were needed to justify the installation of a cable system.

In the early 1970's, two major developments contributed to the growth of cable television. First, there was a reduction in the amount of federal regulation of the cable companies. Second, communications satellite technology made possible the simultaneous delivery of programming to cable operators throughout the country.[1] Communications satellites are launched to an altitude at which they can maintain a stationary orbit over a part of the United States. By the use of transponders (devices on communications satellites), they are able to amplify and reflect signals received from the programmer's earth communication station. The satellite-reflected signal is received by the pay television system's earth station and then distributed over the cable operator's wires to subscribers to the service.

There are now many thousands of cable systems operating in the United States. The industry is very decentralized, with no single company having a substantial portion of the cable subscribers. Some companies own more than one system and are known as MSO's (Multiple Systems Operators). Most cable systems offer at least one pay television channel to their subscribers.

*Pay Television*

Prior to the advent of satellite-fed stations, there was a small amount of pay television transmitted on a fairly local basis. Local cable operators charged for special channels that provided motion pictures and sporting events that were not available on commercial television. They would normally provide the basic cable service for prices ranging between seven and ten dollars per month. They found that they could virtually double their income by providing an additional, pay television service, which was optional and billed as an additional monthly fee. Home Box Office, Inc. ("HBO") was a pioneer in providing movies to be shown over local cable systems. When it went on a satellite in 1975, creating a nationwide network, its sales immediately began to expand.

Initially, it was thought that sports and special programming might be a significant aspect of pay television. However, both of

---

1. Satellite distribution also lowered the programing costs of the local cable operator and has other advantages. *See infra.*

these have to compete with the commercial television market, which can usually offer a larger price for an event of nationwide interest. To the extent that sports programming has been successful on pay television, it has been on a local or, at most, regional basis. The great success in pay television, and the driving force in its growth, has been the new theatrical movie, never before shown on television. As the brochure for Premiere, the programming service that is the subject of these proceedings, states, the "great affection between audiences and films has been responsible for the success of pay television in America."

Cables are not the only way to transmit pay television service. Approximately ten percent of all pay television subscribers are served by other transmission methods, which involve sending signals over the air, but which require special equipment to receive the signals. To date, the systems using these methods have not been enormously successful because of a number of technological problems, but, if these problems can be solved, and thus the enormous cost of installing cable systems avoided, even greater growth of pay television can be expected.[2]

At the present time, approximately 31 million of the 77 million television households in the United States have cable service available to them. (The phrase used in the industry is "homes passed.") Of these, more than half (i. e., 17.2 million) are basic cable subscribers. Of the basic cable subscribers, almost half, 8.3 million, receive pay television.

Most of the cable operators serving these subscribers are affiliated with one or another network program service, although it is still possible for an individual cable opera-

tor to program its pay television channel as a "stand alone."[3] However, there are financial and technical disadvantages to operating individually. The equipment needed to program on a "stand alone" basis is more expensive and more personnel are needed to operate it. Moreover (surprisingly), the satellite-distributed network signal provides a higher quality picture than those transmitted from independent stations using cassettes or disks.

Pay television has grown significantly since its inception in 1972. By 1985, it is estimated that there will be between 16 million and 25 million households subscribing to pay television. Billions of dollars annually will be spent on pay television. So popular is the service that it has promoted the growth of cable systems in major metropolitan areas.[4]

As mentioned earlier, HBO was the early pioneer in pay television and the first to go on satellite. Its name is almost synonymous with pay television. It now has almost 6 million subscribers, which is sixtynine percent of the pay-cable market. HBO's service consists primarily of movies, but it also transmits an increasing number of specials and a decreasing number of sports events. It uses volume discounts to attract operators of large cable systems and MSO's to affiliate with it. It has some exclusive programming, which it generally refuses to license to other pay television companies.[5] HBO has recently started a new, separate, all-movie channel called Cinemax, which is intended to complement its service on cable operations carrying more than one pay channel. HBO realizes that it can promote its "second tier" only if it is not perceived as duplicative by subscribers.[6]

---

2. A satellite company has recently announced its intention to transmit pay television signals directly to subscribers' homes by having them equipped with their own dish-shaped antennas functioning as a simplified earth station. Satellite Week, Dec. 22, 1980, at 1.

3. Such a system negotiates directly with suppliers of individual programming or with brokers.

4. In the last two years, franchises have been granted in ten major metropolitan markets, in-

cluding Dallas, Pittsburgh, Houston, Cincinnati, Oklahoma City, Kansas City, and the twin cities of Minneapolis and St. Paul.

5. HBO first began to use original programming in 1976, to provide a distinctive service and to increase subscriber satisfaction.

6. Cinemax's differentiation from HBO is purportedly through product differentiation; Cinemax shows movies appealing to specific audi-

The next largest network program service is called Showtime Entertainment ("Showtime"), which has 1.4 million subscribers, amounting to sixteen percent of all pay-cable subscribers. Showtime also transmits by satellite. Its programming is relatively similar to HBO's.[7]

The third largest network, The Movie Channel, also transmits by satellite. It has been in operation for only a year, but already has 460,000 subscribers, representing between five and six percent of all pay-cable subscribers. The Movie Channel, as its name connotes, shows nothing but movies. Unlike its competitors, it is on the air twenty-four hours a day, thereby attracting subscribers who work in the evening, which, for pay television (as for commercial television), is the prime time.

All of the pay television networks mentioned above send monthly guides to their subscribers, usually having their featured movie of the month on the front cover, with the feature movie for the following month on the rear cover. These covers promote the service by prominently displaying a top program offering, having substantial subscriber recognition and appeal. Besides the feature movie, each network attempts, every month, to offer several additional feature film hits that have not previously appeared on television. The remainder of their programming is filled out by lower quality new films, "encores" (reshowings of hit movies that premiered on pay television some months earlier), older movies, and some "off-nets" (pictures that have been shown on commercial television). As noted earlier, HBO and Showtime also supplement their programming with specials (such as live musical broadcasts from night clubs or specially produced programs) and sporting events. The evidence at the hearing held in this action clearly established, however, that the new, never-before-shown-on-television, theatrical motion pictures are the prime item offered by pay television networks, without which they could not retain or gain subscribers.

### The Motion Picture Producers

The pay television industry (with rare exceptions) does not produce its own motion pictures. The motion pictures shown are virtually all Hollywood-produced, theatrically released pictures made in the English language. There are at present six major American producers and distributors of motion pictures: Columbia Pictures Industries, Inc. ("Columbia"); Universal Pictures ("Universal");[8] Paramount Pictures Corporation ("Paramount"); Twentieth Century-Fox Film Corporation ("Fox"); United Artists; and Warner Brothers. There are two other "mini-majors" (Disney and MGM) and a number of independent producers. The six major companies, in addition to distributing the films that they produce, also distribute films produced by the independents and others. All of the major motion picture producers do business in this district, are engaged in interstate commerce, receive annual rentals for their films in the hundreds of millions of dollars, and derive revenues from pay television of many millions of dollars.

The production and distribution of new motion pictures is a high-risk, capital-inten-

---

ences, such as children's films and foreign films. Some of HBO's movies, which are more broadly based, are also shown on Cinemax, but are scheduled on the two services with substantial time intervals.

7. Since April 1980, Showtime has followed an "umbrella" programming format, in which its monthly programming is categorized, both internally and for marketing purposes, into various genre groupings. Showtime's monthly schedule is anchored by at least one major movie, which Showtime categorizes as an "A" movie. In addition, Showtime shows three to five lesser hit films, which Showtime catego-

rizes as "B" movies, and one or two theatrically unsuccessful films, which it categorizes as "C" movies. Showtime also airs two to three films categorized as family or children's events, one classic film, one foreign film, four drive-in/exploitation movies, two off-network films, and two or three encores. Finally, Showtime generally shows seven specials, such as made-for-pay-television series, Broadway plays, concerts, and variety shows.

8. Universal Pictures is a subsidiary of MCA, Inc.

sive business.[9] In recent years, the costs of producing and distributing theatrical motion pictures have increased noticeably. The revenues from motion picture theater admissions, however, have not grown correspondingly. One explanation is that, historically, over seventy percent of the movie theater attending public has been composed of people under thirty years of age. Because of changing demographic characteristics of the country, the size of this group is decreasing. The older folks—a group that is increasing in size—tend to stay home and watch television. Because of these changes, as well as the rapidly growing market for pay television, the motion picture producers' interest in pay television revenues has intensified. While their total revenues from this source have been continually increasing, their revenue per television subscriber has been decreasing in some instances, causing concern among the producers, particularly the major studios. Nevertheless, although the pay television network services obtain only one-third of their movies from Columbia, Universal, Paramount, and Fox (the four movie companies involved in this action), they pay for those pictures film rentals amounting to about one-half of their total expenditures, since they believe that these four major producers supply one-half (or more) of the most popular movies on pay television.[10]

New motion pictures do not get shown immediately on pay television. Films are first released theatrically to the motion picture theaters throughout the United States. The length of the theatrical run varies depending on the popularity of the picture.

Some are withdrawn almost immediately when poorly received, while others are so popular that they are re-released for a second theatrical showing the following year. However, the usual length of the theatrical run of a picture is about a year or so.[11] The movie is then available for exhibition on pay television for the next year or two,[12] after which it is sold to commercial television.

Generally, when a film is made available to pay television, all of the existing networks have an opportunity to bid on it. In the past, the length of time a picture would be available to pay television, as well as the number of times it would be shown and, of course, the price to be paid, was a matter for negotiation between individual movie companies and individual network program services. In determining the price to be paid, a prime consideration was how well the picture had done at the theatrical box office. Other factors, such as awards won and suitability of the picture for pay television, were lesser considerations. As mentioned earlier, the motion picture companies distribute some films that they did not produce. On some occasions, the independent producers sell the television rights (both pay and commercial) separately. Thus, it is possible for a pay television network to purchase the pay television rights directly from an independent producer before the film has been distributed theatrically. HBO has been particularly active in this market for what are known as "pre-buys." In this manner, a pay television network can obtain an "exclusive," although it is bargaining, usually, without the benefit of

9. United Artists' recent disaster with "Heaven's Gate," which cost many times its original multi-million dollar budget, opened to disastrous reviews, and then was withdrawn, is a striking example.

10. One indicator of the importance of the movie is whether it appears on the cover of the monthly program guide. These four movie companies provided more than one-half of the cover movies for HBO and Showtime during the last three years, and seven of The Movie Channel's twelve cover movies during its first year of operation.

11. The former practice of opening movies at major theaters and then gradually moving them out to suburban and rural areas has apparently given way to more generalized releases (to gain the benefits of national advertising). Nevertheless, movies do not appear in all locations at the same time, and some areas do not obtain the new pictures for many months. Toward the end of the theatrical run, movies are released to specialized institutions (airlines, hotels, *etc.*) and services, and sold to persons having home video systems.

12. For some movies, the period of availability to pay television is as short as five months.

knowing the theatrical box office appeal or the motion picture critics' reviews.

The entire motion picture industry has viewed the rapidly evolving market of pay television with some alarm. The theater owners are concerned that people will stop going to the movies and will stay home as pay television subscribers. The distributors are concerned that they do not receive nearly as high a percentage of the gross revenues from pay television as they do from theatrical exhibition. When quality motion pictures derived most of their income from a flourishing theatrical market, the collateral pay television licenses were viewed as merely a little bit of gravy. With the market's shift, the bargaining over prices has become much more intensive.

The movie companies have been particularly dissatisfied with the revenues received from HBO. Memoranda from the files of Paramount reveal a continuing unhappiness over the "disproportionate amount of money being retained by the cable operators and the programming companies" [13] and its "ultimate goal of substantially eliminating or severely altering" HBO's dominant position in the pay-cable market.[14] Consequently, it has become the desire of the movie companies to control the distribution of films to pay television. Besides increasing their revenues, according to the views of some at Paramount, such control would also have the effects of mitigating "potential problems on the theatrical distribution side" and of creating an outlet for "marginal productions" that would not otherwise be accepted on pay television.[15]

A plan considered by some of the movie companies was to induce Showtime to join them in an exclusive arrangement. During 1979, various discussions were held as to this possibility, but no agreement was reached because, among other reasons, Showtime's owners were concerned about the antitrust problems of such an agreement with a number of movie companies.

*Premiere*

During the latter part of 1979, most of the major movie companies discussed the possibility of entering a joint venture to start their own pay television network. Warner Brothers, however, already had its own plans under way, which culminated in the creation of The Movie Channel, and therefore was not interested. United Artists also decided not to participate, apparently because of concern over the antitrust problems. (The "mini-majors" (Disney and MGM) declined for various reasons to participate in a joint venture.) The remaining four major producers—Columbia, Universal, Paramount, and Fox—decided that they had sufficient size and resources to participate in a joint venture that could increase their revenues and help them control pay television distribution of motion pictures. Along with Getty Oil Company ("Getty"), in April 1980, they created a joint venture, which they named "Premiere," to set up a satellite-fed network program service designed to be a prime time showcase for the exhibition of feature films on pay television.

The joint venture agreement provides that Premiere is to have certain films distributed by the movie company venturers [16] available to it exclusively for a nine-month period, before those films are shown on the existing satellite-fed network programming services. Premiere is scheduled to begin transmitting its programming on January 2, 1981. It intends to exhibit the new films

---

**13.** Government Exhibit 9, internal Paramount memorandum dated December 12, 1978, from Richard H. Frank, President of Paramount's Television Distribution Division, to the Chairman, President, and Executive Vice President of the company.

**14.** Government Exhibit 17, internal Paramount memorandum dated April 19, 1976, from Alan Fields to the President of Paramount.

**15.** Government Exhibit 13, internal Paramount memorandum dated February 22, 1980, from Ron Nelson to Richard Frank.

**16.** The films to be contributed by the venturers for the nine-month period of exclusivity are those theatrically released after November 1, 1979, which the venturers have decided to make available to pay television.

contributed by the venturers as exclusives, as well as a larger number of other films obtained from venturers or other producers and distributors. (Most of these latter films would not be new to the pay television market and would not be obtained on an exclusive basis.)

Under the joint venture agreement, the four motion picture producers are to contribute films [17] to the venture, and their contributions are to be valued according to a rather complex allocation formula, designed to assign relative values to the different contributions, first as between cash and films, and then as among the specific films contributed. Each film is initially valued at $1 million. To arrive at the total value of the films contributed in a year, the total number of films is multiplied by $1 million. To determine how revenues are to be paid back to each of the movie companies, that aggregate value is allocated among the films contributed on the basis of the ratio of each film's theatrical rental expressed as a percentage of the total theatrical rentals of all films contributed that year, although there is a maximum value placed on each film (regardless of the box office rentals) of $4 million, and a minimum of $250,000. The critical criterion for allocating revenues to the movie companies for their pictures is the box office rentals of the pictures, although the evidence indicates clearly that theatrical revenues are accurate indications of pay television popularity only about one-half of the time.

Any net revenues remaining after the payment of Premiere's current operating costs, capital expenditures, and the cost of licensing movies are to be used to return each venturer's contributions, with the movie companies' contributions being valued according to the allocation formula.

After all venturers have received a complete return of their contributions, any remaining net revenues are to be distributed equally among the five participants as profits. The allocation formula precludes a movie company from negotiating with Premiere for a higher allocation for a particular film than would be received under the formula, even if in its business judgment the film's value to pay television was not properly reflected in its box office rentals, and, conversely, requires adhering to the allocation even if Premiere believes the film will not be as well received on pay television as it was at the box office. The movie companies have thus agreed on the price for their motion pictures, replacing the prices that would normally be set by the marketplace with a transaction between themselves and Premiere that places a value on each film, within a minimum and maximum range, and allocates revenues to the movie companies for their pictures by a formula.

Critical to the operation of this venture is the nine-month "window," during which the films contributed by the movie companies are to be available only to Premiere, among the network pay television services.[18] Under the agreement, the movie company venturers can license their films to nonsatellite pay-cable television and to the pay systems that do not use cable. However, as indicated earlier, these amount to only ten percent of the pay television market. In addition, following the nine-month window, the movie company venturers are free to license their films to the existing satellite-fed network program services. But, to date, those services have refused to license what they consider to be "used goods." During 1981, there will be approximately thirty-nine to forty-five movies subject to the window.[19] It is undisputed that the venturers consider

17. Besides contributing films, each of the motion picture venturers is to contribute $2.5 million in cash. Getty (as will be described more fully below) is, however, the principal cash financier.

18. The four movie companies are not required to release their films for pay television, but if

they do so, they must give them first to Premiere.

19. Films distributed by the movie company venturers to which they do not hold the television rights are obviously not involved. Nor are films which are not put into general theatrical release.

this nine-month window [20] essential and would not have participated without it.

Getty's role in this joint venture is primarily as a financial backer. It is obligated to contribute a total of $30 million to the venture, of which it has already spent $7.4 million.[21] Getty is, of course, primarily a multi-billion dollar oil company engaged in the various aspects of the petroleum industry, but it also has an eighty-five percent interest in Entertainment and Sports Programming Network, Inc., which offers sports programming to cable television.[22]

Premiere has its own separate officers and employees—a total staff of approximately forty-five. Its management has final authority over scheduling decisions and negotiates licenses for all films except those contributed as part of the nine-month window. Premiere also has a management committee comprised of members representing each of the venturers.[23]

*This Action and the Motion for a Preliminary Injunction*

The United States Government views the Premiere joint venture agreement as violating the antitrust laws. It commenced this action against the five venturers (the four movie companies and Getty) on August 4, 1980, alleging that the agreement establishing Premiere constitutes price-fixing and a group boycott, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. On August 15, 1980, the Government moved for a preliminary injunction, pending adjudication of the merits after a full trial, to restrain the venturers from licensing or otherwise making available any motion pictures to Premiere and from taking any further steps to effectuate the implementation of Premiere.

On August 12, 1980, Premiere, the joint venture, filed a motion for leave to intervene as a defendant, and, on August 29, 1980, this Court granted Premiere's motion. Thirty-two states have filed a brief as *amici curiae* supporting the Government's motion for a preliminary injunction.[24]

Certain discovery, limited to matters that in the Court's view were necessary for the determination of the pending motion for preliminary relief, has been conducted of the defendants, the Government, and certain nonparties, notably HBO, Showtime, and The Movie Channel, the principal satellite-fed pay television network program services in operation today.[25]

Between November 20 and December 8, 1980, an evidentiary hearing, addressed to the Government's preliminary injunction motion, was conducted. The Court heard testimony from representatives of each of the existing network program services, from Premiere and each of the venturers, from producers and distributors of theatrical motion pictures that also license their product to pay television, and from certain industry and economic experts. The defendants, in addition to extensive cross-examination of the Government's five witnesses, called twelve witnesses of their own.

Simply stated, the Government's position is that the agreement establishing Premiere

---

**20.** The joint venture agreement provides for a periodic review of the length of time involved in the window.

**21.** The movie companies have already contributed $2.9 million, for a total expenditure to date of $10.3 million.

**22.** Getty is, of course, engaged in interstate commerce and transacts business within this district.

**23.** The negotiations for films not contributed as part of the joint venture are confidential, and Premiere's employees may not disclose the terms of other license arrangements to any of the joint venturers.

**24.** Various other parties have sought to file amicus briefs or intervene on one side or the other. While their briefs have been read, since they often proceed from erroneous factual assumptions, they have limited utility and have been neither formally received nor relied on.

**25.** While the discovery was limited for an antitrust case, it was expansive for an ordinary action. Tens of thousands of documents were reviewed and numerous witnesses deposed. Moreover, the movie companies' intimate knowledge of industry conditions is evident in their drawing on their long experience in the industry in attempting to justify their joint venture as necessary.

violates the antitrust laws. The Government contends that the crucial provisions of the agreement constitute *per se* violations, but argues that the agreement is also illegal under any antitrust theory, including the "rule of reason." The defendants maintain, on the other hand, that their venture should be construed solely under the rule of reason and that, in light of existing market conditions, it is a necessary, and not illegal, attempt to gain a foothold in the market.

*Pay Television's Current Market Conditions*

The lengthy hearings conducted on the motion for a preliminary injunction (more than adequate for a trial on the merits of any sort of case other than antitrust) gave an extensive insight into the current conditions in the pay television industry. As indicated earlier, the industry is in the midst of a boom that is causing some radical changes in its present structure. The old twelve-channel cable systems are rapidly being replaced. Although approximately seventy percent of the existing systems had only such limited capacity as of late 1979,[26] some of these are being upgraded to increase their channel capacity.[27] The new systems typically have at least thirty channels, and some have fifty or more. Where there is only a twelve-channel capacity, existing regulations and economic conditions usually result in there being no more than one pay channel offered by a cable system. Nevertheless, there are already 300 to 400 cable systems offering "multi-pay" (*i. e.*, more than one pay channel), and there are

expected to be more when Rainbow Programming Service begins operations in January 1981. It is estimated that, by 1985, thirty percent or more of all subscribers may have more than one pay television subscription.

Premiere's initial attempt to enter the market will be directed chiefly to existing systems with large channel capacities and the "new builds" (*i. e.*, newly built systems). To date, the "tiering" of pay channels by cable operators has worked better than industry officials had anticipated. It seems to operate best in new systems where the subscribers are unsophisticated and are likely to accept a package of two or more relatively similar pay networks. In the opinion of the Court, however, the willingness of subscribers to take such packages [28] will diminish if the subscribers perceive too much duplication, which will result in the disconnecting of excess pay services.

The defendants contend that there is substantial vertical integration in the market and that the largest MSO's have integrated backwards into ownership of network program services. Actually, there is virtually no complete vertical integration.[29] Only Warner Communications Company has any degree of total vertical integration, from movie company down to cable system. Its subsidiary, Warner Brothers, produces and distributes films, many of which are shown on The Movie Channel, although Warner Brothers films are only a small part of the total number of pictures exhibited by that

**26.** The fact that seventy percent of the cable systems are so limited does not necessarily connote that the same percentage of subscribers are affected. The large metropolitan cable systems, which serve large numbers of subscribers, generally have a greater capacity than rural systems serving fewer subscribers.

**27.** Upgrading of existing systems, however, is both time consuming and expensive.

**28.** The packaging of multi-pay services is often done with a discount; *e. g.*, if the first service costs $8 per month, the second may sell for $6, and the third for $4. Obviously, the willingness of a subscriber to pay for somewhat duplicative services depends upon the pricing of the package.

**29.** The economists who testified for the parties do not view the market identically. The Government economist's view, which the Court accepts for this purpose, is that the market is essentially a single chain of distribution from movie producers to distributors to pay television distributors to cable operators and finally consumers. (It should be noted that the motion picture company defendants are all producer-distributors, although they do distribute some films that they do not produce.) The defendants' economist viewed this chain as two separate markets, one from producers to distributors to the pay television networks and the other from the networks to cable systems to consumers. This Court does not perceive any controlling distinction in these two views of the market.

network. The Movie Channel is owned by Warner Amex Satellite Entertainment Corporation, a wholly owned subsidiary of Warner Amex Cable Communications, which in turn is a joint venture between Warner Communications Company and the American Express Company. Warner Amex Cable Communications, the nation's fifth largest MSO, owns approximately 120 cable systems and has approximately 665,000 basic subscribers and 230,000 pay subscribers. However, The Movie Channel, besides the facts that it shows motion pictures from all producers, not merely Warner Brothers, and that it appears on cable systems not owned by Warner companies, is at present the smallest of the satellite-fed pay television networks, having only five to six percent of the market.

There is, however, some degree of integration between cable systems and network program services. Four of the five largest cable operators, and six of the top nine, have integrated backwards into, or have some type of ownership relationship with, pay television network program services.[30] Taken together, cable operators with an ownership interest in present or planned pay television network program services account for 5,246,000 basic cable subscribers, or thirty-three percent of all basic subscribers in the United States.[31] (It should be noted, however, that the percentage of the total cable market controlled by companies having ownership connections with the three existing satellite-fed network program services has been declining.) Besides the Warner companies, several other groups of companies exhibit some degree of vertical integration between cable systems and network program services.

Time, Inc., a major media company, bought HBO when it was still in its infancy. Thereafter, Time acquired American Television and Communications Corporation ("ATC"), the nation's second largest MSO, which owns seventy-eight cable systems and partly owns another twenty-five, and also acquired Manhattan Cable Television. Consequently, Time owns or has control over more than 100 cable systems, which have 1.2 million basic subscribers and 648,000 pay subscribers. HBO is offered to virtually all of these subscribers but, even cumulatively, they amount to only about ten percent of HBO's viewer market.[32] Although Time has a subsidiary that produces a limited number of motion picture films, to date none of these films have been shown on HBO.

Showtime is a joint venture of Teleprompter, the nation's largest MSO, and Viacom, the nation's seventh largest. Teleprompter is the owner of 109 cable systems and part owner of nine others. Viacom has full ownership of twenty-five systems and part ownership of six. Teleprompter and Viacom together wholly or partly own 149 cable systems, having 1.7 million basic subscribers, of which 607,000 also are pay cable subscribers.[33] Showtime at present has 1.4 million pay subscribers, approximately two-thirds of which are carried on cable systems not owned by either Viacom or Teleprompter.

A new entrant about to start in the pay television field is Rainbow. Rainbow is owned by Rainbow Programming Services Corporation, which is a joint venture among four MSO's—Cablevision Systems, Daniels

**30.** HBO is a subsidiary of Time, Inc. Since Time did not acquire its major cable interest, American Television and Communications Corporation, until after the start of HBO, that was a forward integration.

**31.** These figures include the Rainbow network, which has not yet started its service and at present has no subscribers, although it is assumed that it will obtain a substantial number of subscribers from those who subscribe to its affiliated cable systems. *See* text discussion concerning Rainbow *infra* and note 34 *infra*. These figures also include Sammons Communi-

cations, a part owner of one of the joint venturers in Rainbow.

**32.** HBO has between 5 million and 6 million subscribers and is carried on approximately 2,500 cable systems.

**33.** Teleprompter has approximately 1,280,000 basic subscribers, 433,000 of whom also take a pay service. Viacom has approximately 444,000 basic subscribers and 174,000 pay subscribers.

& Associates, Cox Cable, and Comcast Corporation. These four MSO's have approximately 1,283,000 basic subscribers.[34]

There is evidence to indicate that, where a vertically integrated cable system carries multi-pay services, it will structure its offerings to favor the program service with which it is affiliated. Generally, however, a cable operator has much to gain and little to lose (assuming he has adequate channel capacity) in offering additional pay services, even though they may compete with his affiliated service. Nevertheless, unquestionably, having existing affiliations assists market entry for new program service ventures. The affiliations give an initial subscriber base from which to start.

Despite the obvious advantages to a program service in having affiliations with cable systems, the extent of vertical integration in the market does not appear to constitute an insurmountable barrier to entry into the market. At present, only twenty percent of all basic subscribers are served by cable systems that are affiliated with one of the existing network program services. HBO pioneered in the pay television industry (and, indeed, went on satellite) before it had any significant affiliations with cable systems. The overwhelming majority of potential pay subscribers are at present in a free and open market. New entrants are coming into the field both with and without existing cable affiliations. This is clearly a growth industry and, with an anticipated tripling of pay subscribers in the next five years, new services should be able to enter the market without pre-existing cable affiliations.

The defendants contend that, in addition to their lack of any cable system affiliations and the limitations on channel capacity in the older cable systems, numerous other barriers to entry confront them. One they particularly emphasize is the limitation of available transponder space on existing satellites. RCA's Satcom I is now the satellite primarily used for transmission of programming to cable systems. It has twenty-four transponders, of which twenty-one are used to transmit programming to cable systems. (Two are inoperative, and one is used for message traffic.) HBO, Showtime, and The Movie Channel transmit their programming from Satcom I.

Demand for transponder space on Satcom I is heavy, and several different programmers are sharing space on some transponders. Earth stations used by cable systems to receive satellite signals must be directed toward the transmitting satellite and are at present able to receive signals from no more than one satellite at a time. Because of the large number of programs transmitted from Satcom I, virtually all cable operators have pointed their earth stations at Satcom I. A pay television service needs two transponders to provide adequate coverage in all United States time zones. (The two transponders transmit identical programming, three hours apart.) Each of the three current network program services—HBO, Showtime, and The Movie Channel—has at least two transponders on Satcom I.

Premiere now shares transponder space on Satcom I with Home Theatre Network. Because that space is unavailable during prime time for East Coast transmission, Premiere can use it only to transmit its West Coast service. Premiere also has space on Comstar and Westar. The practical problem with the use of other satellites is that cable systems receiving them must have additional earth stations.[35]

These satellite problems appear to be transitory. Satcom I is expected to have only a few more years of operation. New satellites are scheduled for launching in the not too distant future. The burgeoning industry will inevitably require additional space. Moreover, if the incentives are great enough, it is possible to sublease additional Satcom I space from the present lessors.

---

**34.** Sammons Communications, part owner of Comcast, is the nation's ninth largest MSO. It wholly owns 50 cable systems and partly owns two; Sammons has 378,000 basic subscribers.

**35.** In the past, these earth stations have been quite expensive (*i. e.*, $20,000 per station), but technological advances may solve some of the problems and reduce the costs materially.

The defendants argue that, in the absence of a captive subscriber base available to them, they must have a differentiated product in order to enter the existing market. In any industry, a new entrant must usually either differentiate his product or sell it at a lower price. Since the latter approach is inconsistent with the movie company venturers' reasons for entering the market, they are left with the alternative of product differentiation. The defendants contend that the sole way to differentiate their product is by having a nine-month exclusive use of their own new movies released for television.

There are a number of ways of achieving product differentiation without cornering the market on one-half of the hit motion pictures being produced by Hollywood. Warner Amex seems to have differentiated its product, The Movie Channel, by offering a twenty-four hour service. Other network program services are attempting to differentiate by adding specials to the normal fare of motion pictures; the enormous production capacity of the movie company venturers could certainly provide original special programming. Other new entrants, such as Rainbow (which is scheduled to start on January 1, 1981), are attempting to differentiate by either showing different types of motion pictures or carrying other types of programming.[36]

The argument the defendants return to repeatedly is that the network program service market is dominated by a single company, HBO, which has both monopsony power[37] and monopoly power. Undoubtedly, as indicated above, HBO, by its pioneering efforts, has achieved a very substantial portion of the existing market. It has already obtained a substantial profit margin and a high return on investment, which it probably will be able to continue for some years to come. Its use of volume discounts has assisted it in obtaining affiliations with large cable systems. Certain of its practices, such as the obtaining of exclusive licenses, which it refuses to share with other networks, and its selective tactics in purchasing from motion picture producers, do suggest the exercise of monopoly or monopsony power.[38] However, it is to be expected that the first entrant in the industry would have a substantial head start and that new entrants would have some catching up to do. Nevertheless, there appears to be no shortage of companies willing to undertake this task. Some (like The Movie Channel) may make a successful entry and, undoubtedly, others will fail, but neither the history nor the present condition of the market justifies the belief that HBO can successfully bar all new entrants.

## THE LAW

### The Rule of Reason Versus the Per Se Rule

■ Section 1 of the Sherman Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Despite the statute's all-inclusive language, since the Supreme Court's decision in *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the "rule of reason" has been the test most commonly used

---

**36.** *See* discussion concerning Cinemax *supra.*
The new Rainbow project will reportedly be divided between cultural presentations and action movies, or "R" rated movies not generally carried by the other networks. In addition, it may offer "sneak previews" of theatrical pictures never before shown on pay television.

**37.** Monopsony power is that possessed by a buyer of a product who purchases such a large percentage of the producers' output that it can control the price it will pay.

**38.** The testimony of the Government's economist suggests that the Justice Department's present view of HBO is that it does not have sufficient market power to constitute a violation of section 2 of the Sherman Act. This view may be based, in part, on a recognition of the competition from other media for the same consumers (*e. g.*, motion picture theaters and commercial television) and the present relatively small percentage of consumers who see their movies over pay television. Whether the Justice Department view will remain the same if pay television's growth is as extraordinary as predicted and HBO retains the same portion of the market is yet to be seen.

to evaluate restraints of trade alleged to violate the Sherman Act. *United States v. Topco Associates*, 405 U.S. 596, 606–07, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). The *per se* rule is applied only to "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Moreover, "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Associates, supra*, 405 U.S. at 607–08, 92 S.Ct. at 1133–1134.

■ Two of the types of business practices restraining trade that have been found presumptively unreasonable and thus subject to the *per se* rule, however, are price-fixing, *see, e. g., United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), and group boycotts. *See, e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). These, of course, are the types of business relationships the Government alleges that the defendants have established in the Premiere agreement. The defendants contend, first, that their agreement does not provide for price-fixing or a group boycott (at least, as those terms are defined for purposes of the antitrust laws) and, second, that even if it does so provide, the circumstances of this case preclude application of the *per se* rule to their agreement.

Arguing that the *per se* rule should be used only in rare situations, the defendants cite recent cases in both the Supreme Court and the lower courts that reveal a reluctance to apply the *per se* rule. *See Broad-*

*cast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Evans v. S.S. Kresge Co.*, 544 F.2d 1184 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). Those cases are distinguishable from the instant case, however.[39] Moreover, far from burying the *per se* doctrine, the Supreme Court has recently reiterated it in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), finding unlawful *per se* a horizontal agreement not to extend interest-free credit (which the Court equated with a discount and thus considered to be an inseparable part of the price, therefore justifying the label of price-fixing). 100 S.Ct. at 1927. The *per se* doctrine applied in the past in such cases as *United States v. Topco Associates, supra*, remains intact. Thus, the first step in the legal evaluation of the challenged provisions of the Premiere agreement must be a consideration of whether they fall in the categories of illegal price-fixing and group boycott.

### Price-Fixing

■ Price-fixing, as has been noted, is *per se* illegal. The fact that the Premiere agreement does not set specific prices for individual movies released to Premiere by the movie company venturers, but rather provides an allocation formula for the valuation of those movies,[40] does not remove it from the definition of price-fixing. Courts have repeatedly found that the use by competitors (which the movie company venturers surely are) of a formula to establish or stabilize prices is *per se* illegal. *See, e. g., Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). Nor does the defendants' characterization of their pricing formula as a

**39.** *Continental T.V.* is distinguishable because it concerned vertical, rather than horizontal, restraints. *Evans* is distinguishable because it concerned a type of business arrangement with which the courts have had insufficient experience to justify the *per se* label and because the arrangement lacked the element of competition

between the parties needed to justify categorizing it as a horizontal agreement. 544 F.2d at 1191–93. For a discussion of *Broadcast Music, see infra*.

**40.** For an explanation of the allocation formula, *see* text discussion *supra*.

formula for valuing and repaying non-cash investments remove it from the category of price-fixing. Repayment for the investment of a film in a programming service clearly amounts to the same thing as payment of a price for the selling of a film to the programming service.

■ The defendants' argument that, even if their formula is considered a pricing formula, it cannot be considered price-fixing in an antitrust sense, because it sets prices only among the defendants and not to third parties, is more troublesome. Normally, price-fixing in violation of the antitrust laws involves fixing of prices to be charged to third parties. *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). Although Premiere itself could perhaps be considered the third party, the fact that Premiere is the creation of the alleged conspirators makes this an unusual price-fixing situation.

Besides the allocation formula for the movie companies' films, the other pricing transaction subject to challenge is Premiere's pricing of its programming service to the cable systems and the role of the movie company venturers in that pricing. The price for the programming service is clearly a price charged to third parties. But the defendants argue that this pricing agreement escapes the price-fixing label because it concerns the pricing of a new product by the joint venture rather than a joint agreement by the movie companies to fix the prices of their movies. In urging that such pricing is not *per se* illegal, they rely on *Broadcast Music, Inc. v. CBS, Inc., supra*, a case involving blanket licensing of musical works, in which the Supreme Court found that conduct that was "literally 'price-fixing'" was not a *per se* violation of the antitrust laws.[41] 441 U.S. at 9, 24–25, 99 S.Ct. at 1557, 1565. *Broadcast Music*, however, arose in a "unique context," characterized by "the lower court's continuing scrutiny and control of defendants' activities," "the approving position of the Department of Justice," "the indirect approval of blanket licensing by Congress in the new Copyright Act," and "the need for the two organizations and the efficiency of blanket licensing."[42] Louis, *Restraints Ancillary to Joint Ventures and Licensing Agreements*, 66 Va.L.Rev. 879, 898 & n. 128 (1980).

*Group Boycott*

■ A joint refusal to deal, or group boycott, is also usually considered a *per se* violation of the antitrust laws. The Premiere agreement certainly includes a joint refusal to deal in the nine-month window.[43]

**41.** The Court left open the question of whether the "price-fixing" might be illegal under the rule of reason. 441 U.S. at 24–25, 99 S.Ct. at 1565.

**42.** The Court, in discussing the blanket license obtained by the defendants (BMI and ASCAP), accompanying the integration of sales monitoring and enforcement against unauthorized copyright use, noted that:

ASCAP and the blanket license developed together out of the practical situation in the market place: thousands of users, thousands of copyright owners, and millions of compositions. Most users want unplanned, rapid and indemnified access to any and all of the repertory of compositions, and the owners want a reliable method of collecting for the use of their copyrights. Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers.

441 U.S. at 20, 99 S.Ct. at 1562–1563.

Moreover, since the rights granted to the defendants were nonexclusive, those who did not wish to purchase the defendants' blanket licenses could purchase the rights individually from each composer. Consequently, as the Court noted, the alleged price-fixing restraint could be entirely avoided: "there was no legal, practical, or conspiratorial impediment to CBS's obtaining individual licenses; CBS, in short, had a real choice." *Id.* at 24, 99 S.Ct. at 1564.

**43.** The agreement states:

Within the nine-month period of availability to the Venture such Motion Pictures shall not be made available for exhibition to any other Network Program Service transmitted by satellite to more than one Pay Television System unless such Systems are under common ownership or control.

Government Exhibit 2, Memorandum of Understanding of Basic Terms Relating to Joint Venture to Offer Network Program Service to Pay Television at 5.

The defendants correctly point out that courts frequently have refused to apply the *per se* rule to certain types of boycotts. *See, e. g., Worthen Bank & Trust Co. v. National BankAmericard, Inc.*, 485 F.2d 119 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir., 1980).

Those cases, however, are very different from the instant one. *Worthen Bank & Trust Co.* involved an unusual situation in which joint action was required in order for the *industry* to function—in that case, the bank credit card industry.[44] 485 F.2d at 127. Obviously, since it is already being done, program services can function without a group boycott; here, the asserted justification for the boycott is not to enable the industry to function, but rather to enable a new company to enter the field successfully. *E. A. McQuade Tours, Inc.* and *Realty Multi-List, Inc.* involved screening criteria for listing services, which are much milder restraints than the flat refusal of the movie company venturers to license the films they contributed to Premiere to any other satellite-fed network program services.

█ This boycott may not be a classic group boycott, which one court has defined as "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C.Cir.1978). Nevertheless, it does seem to fit at least one of the three categories of group boycotts subject to the *per se* rule, as listed in the other three cases discussed— that of "combinations designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors." *E. A. McQuade Tours, Inc.*, 467 F.2d at 187. *See Worthen Bank & Trust Co.*, 485 F.2d at 124; *Realty Multi-List, Inc.*, 1980–81 Trade Cases (CCH) at 77,304. This category does not require that the boycott victims be at the same level of distribution in the industry. Moreover, in that category, as in the other two,[45] the "touchstone of *per se* illegality" is the "purpose and effect of the arrangement," particularly the presence of "exclusionary or coercive conduct." *E. A. McQuade Tours, Inc.*, 467 F.2d at 187. There is ample evidence that the nine-month window was meant to be "exclusionary and coercive." *See, e. g.*, notes 13 & 14, *supra* and accompanying text.

The fact that the films subject to the nine-month window will ultimately be available to the other network program services does not shield the boycott from the application of the *per se* rule. Joint attempts to control the initial issuance of motion pictures have already been condemned. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 144–48, 150–51, 68 S.Ct. 915, 922–924, 925–926, 92 L.Ed.

---

**44.** The court noted that the credit card system at issue did not set uniform discount rates or interest rates or make exclusive territorial assignments, but that it prevented the bank from joining (at least as a sponsoring bank) the competing system (Master Charge). For purposes of the motion, the court assumed that the defendant was acting in good faith and for legitimate business reasons, including the desire to promote competition (which the restraint did). It also assumed that without the restriction there would be a substantial lessening of competition and a merging of the two systems. The court also noted that the restraint did not have any of the usual indicia of a group boycott and that the joint venture had produced a product that would otherwise not exist. The Department of Justice agreed that the by-laws were reasonable and promoted competition and that the new technological developments would permit better and cheaper services to cardholders. In short, the administration of the product in the market (rather than the economic competition) justified the restraint.

**45.** The other two categories are "horizontal combinations among traders at one level of distribution, whose purpose was to exclude direct competitors from the market" and "vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination." *E. A. McQuade Tours, Inc.*, 467 F.2d at 186.

1260 (1948) (ironically, involving some of the same defendants as in the instant action).[46] *See also Klor's, Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 213, 79 S.Ct. at 710 (refusal to sell at the same prices and conditions can be a boycott as well as complete refusal to sell).

*Applicability of the Per Se Rule to the Premiere Agreement*

█ An examination of the relevant provisions of the Premiere agreement in light of the case law defining price-fixing and group boycotts suggests that the nine-month window is a group boycott within the scope of the *per se* rule. The allocation formula is more difficult to categorize as *per se* illegal price-fixing and perhaps requires examination in a broader context.

Besides their arguments that the provisions of the agreement do not constitute either price-fixing or a group boycott, however, the defendants contend that the total context of the agreement and this action take these provisions outside the scope of the *per se* rule. Specifically, they argue that joint ventures and the restraints ancillary to them are generally treated under the rule of reason rather than the *per se* rule.[47] The defendants suggest that extensive discovery is required (taking years per-

haps), followed by a lengthy trial on the merits, before the operation of their joint venture could appropriately be found unreasonable and enjoined.

The fact that the defendants have chosen a joint venture as the vehicle for their combination, however, does not necessarily change the applicable analysis. In *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), competing bedding manufacturers formed a joint venture to market their products collectively. Prices were set among the venture participants. The Court, using a *per se* analysis, held that the vehicle of a joint venture did not prevent the agreement from being "flagrant and pervasive price-fixing, in obvious violation of the law." *Id.* at 355–56, 87 S.Ct. at 1851–1852. *See also Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

It is true that the courts have sometimes analyzed restraints ancillary to a joint venture under the rule of reason rather than the *per se* rule. These are cases like *Worthen Bank & Trust Co. v. National BankAmericard, Inc., supra,* and *Broadcast Music, Inc. v. CBS, Inc., supra,* which, as has already been noted, are very different from the instant case. Unlike the price-fixing in

---

**46.** The Supreme Court also said of these defendants in the *Paramount Pictures* case, concerning their use of "clearances" (periods of time that must elapse before a second theater could show a film already exhibited by another theater in the area)—an approach not unlike the nine-month window: "That is too potent a weapon to leave in the hands of those whose proclivity to unlawful conduct has been so marked." 334 U.S. at 147. (Implicit in the Court's approach is the conclusion that the first run of a movie—there in theaters, here on television—is a separate market.)

In another case involving some of the defendants in this case, *William Goldman Theatres, Inc. v. Loew's, Inc.,* 150 F.2d 738 (3d Cir. 1945), *aff'd,* 164 F.2d 1021 (per curiam), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948), a Philadelphia theater operator complained that the major motion picture companies had concertedly refused to license first-run films to him while licensing those films to his competitor, a subsidiary of one of the motion picture companies. The Third Circuit found the practice illegal as an unreasonable restraint on competition.

**47.** The Government, on the other hand, views Premiere as a classic cartel and a clear *per se* violation of the antitrust laws. As the Government defines it, a cartel is an association of competing firms that come together for the purpose of raising prices. In general, a cartel has the following characteristics: (1) a mechanism for agreeing on the price to be charged; (2) a mechanism for dividing profits from the cartel; (3) a mechanism for preventing cheating on the cartel by individual members of the cartel; and (4) a sufficiently large share of the market so that limiting output will have the prospect of raising prices. The Government contends that all of these factors are present here. The use of box office rentals in the allocation formula, as mentioned earlier, has little rational basis and has been adopted merely to avoid disputes among the motion picture producer defendants. The prices set replace those which had previously been negotiated in the marketplace. It also make cheating by the venturers on prices almost impossible.

*Broadcast Music* and the restriction against member banks of a credit card system joining competing systems in *Worthen Bank & Trust Co.*, the restraints embodied in the Premiere agreement are hardly ancillary; in fact, they appear to be the heart of the joint venture and its reason for being. In addition, in contrast to the situations in *Broadcast Music* and *Worthen Bank & Trust Co.*, the circumstances in the instant case include already existing markets—a market for the product Premiere proposes to sell and a highly competitive market for the product that the movie company venturers propose to reserve solely to Premiere. As the Supreme Court implicitly held in *Citizen Publishing Co. v. United States*, 394 U.S. 131, 134–36, 89 S.Ct. 927, 928–929, 22 L.Ed.2d 148 (1969), "[c]ompetitors, especially those dominating a market, generally may not transfer to a joint venture their most competitive commercial functions." *Louis, supra* at 889.

Finally, the defendants' position that its conduct is shielded from *per se* treatment rests on two factual assumptions, which this Court finds completely unwarranted. The first is the claim that Premiere creates a totally new product in the pay television market, consisting of a package of movies and their transmission and promotion. It is true that, as to the defendants and pay television program distribution, Premiere is a new venture. The heart of that venture, however, is the fifty or so new, never-before-shown-on-television, motion pictures that the defendants annually distribute and would, otherwise, be selling to the existing market.

The defendants' second claim is that Premiere is a rational economic response to market conditions, necessary to enable it to enter the market, and not an attempt to control it.[48] The construction of the Premiere venture is concededly very clever and would, almost certainly, gain the defendants a successful entry into the market. In structuring their venture, however, the defendants are arrogating to themselves one-half of the essential product of the industry. As the Supreme Court said in *United States v. Topco Associates, supra*:

> Our inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formulated *per se* rules.
>
> In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition.

405 U.S. at 609–10, 92 S.Ct. at 1134–1135.

*The Premiere Agreement Under the Rule of Reason*

Although it is probable that the *per se* illegality of at least one of the challenged provisions of the Premiere agreement can be demonstrated, there is, as has been noted, some question about the applicability of the *per se* rule to the other challenged provision. Thus, since considerable discovery has already been taken and an evidentiary hearing has been held, it is appropriate to consider the agreement briefly

**48.** The defendants have not made it clear whether they are attempting to justify their own restraints because of the alleged monopolistic practices of HBO. Their ambivalence is understandable. The Supreme Court, in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–22, 60 S.Ct. 811, 843–844, 84 L.Ed. 1129 (1940), stated:

> Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or

fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination.

This principle was emphatically stated in *American News Co. v. Federal Trade Commission*, 300 F.2d 104, 110 (2d Cir.), *cert. denied*, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962): "[R]esort to practices outlawed by the antitrust laws cannot be justified by the fact that the practices were a defense to illegal activity." *See also Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

under the rule of reason, at least for the purpose of predicting what might be demonstrated at trial.

■ The test of legality under the rule of reason is "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). In making that determination, "the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Id.*

■ Consideration of these facts, insofar as they have been revealed or suggested by the evidence presented at or in conjunction with the preliminary injunction hearing, leads to the conclusion that the Government would probably be able to demonstrate the unreasonableness of the Premiere agreement at trial.

Premiere's pricing mechanism, seen in the broader context of the pay television business, appears to be anticompetitive and thus unreasonable. The defendants have, in effect, substituted a profit sharing formula for the competitive negotiations over the value of individual films in the pay television market, in which the movie company venturers used to engage. The price to be charged by Premiere to the cable operators has no fixed cost base and thus can be manipulated to control the market. Since the movie company venturers in recent years have received approximately one-half of the *motion picture licensing* fees paid by the network programming services, they seem likely to have sufficient economic power in the future to control the market by setting the price and conditions of sale of motion pictures licensed to pay television. The ultimate effect of Premiere's pricing mechanism could thus be not only to raise the prices of films licensed to pay television, but also to eliminate competition in the network program service market through the manipulation of the price of Premiere's product.

The allocation formula could serve another anticompetitive function. Even without the nine-month window, the defendants could release their pictures to Premiere and stall negotiations with its competitors, claiming that the prices being offered were inadequate. Since there is no established price to be paid by Premiere, the existing satellite-fed networks would have difficulty in demonstrating that they were victims of the defendants' refusal to deal with them.

The boycott provision also appears to be anticompetitive and thus unreasonable under the limited rule of reason analysis that is possible at this time. The movie company venturers are responsible for approximately one-third of the movies and one-half of the revenues paid for movies in the network program service industry. It is unlikely that these defendants could establish that the drastic restraint the nine-month window represents is necessary in order to enable a new competitor to enter the market.

Although the defendants argue that the films subject to the boycott will have the same value to the existing network program services at the conclusion of the nine-month window as they had at the start, Premiere's own advertising contradicts that assertion. The venturers are using their exclusive control of these films for nine months as Premiere's major selling point. While it is undoubtedly true, as the defendants argue, that the rare, outstanding film can be shown many times (even after it has appeared on commercial television) and will still draw a substantial market, the evidence is overwhelming that "golden oldies" are not the essential element of pay television; it is the new, never-before-shown-on-television, motion picture that the subscriber pays his money for. The other new pictures of nondefendant movie producers, which would be available equally to Premiere and the rest of the market, are not sufficient to allow equality among competitors. As Premiere's own brochures state: "Affiliates to the Premiere network will be showing major motion pictures to their sub-

scribers nine months before any other satellite fed pay television network. . . . Your customers will be asking for Premiere."

The effect of the nine-month window will be to withdraw from the network program services other than Premiere about one-half of the most desirable first-run films. For example, prior to the formation of Premiere, the existing networks had been negotiating to obtain pay television rights for late 1980 or early 1981 for "All That Jazz," "The Electric Horseman," "The Jerk," and other such movies, which were withdrawn immediately when the venture was consummated.[49]

Even though films theatrically released after November 1, 1979, are subject to the nine-month window, because of the usual delay between the theatrical release of motion pictures and their release to pay television, the existing networks are only now beginning to feel the effects of the boycott. Since the announcement of Premiere, the existing networks have refused to purchase post-window rights to the excluded films.[50] Although they have been moderately successful in stretching out their existing inventory to date, it appears clear that by 1981 their program offerings will start diminishing in quality. When this occurs, the number of disconnections by subscribers will likely increase. This, of course, will result in diminishing revenues. For new and struggling companies like Showtime and The Movie Channel (neither of which has shown a profit to date), this could be disastrous. If Premiere were allowed to continue operating with the nine-month window during the years it would take to complete discovery in this case, and conduct a full trial on the merits, Showtime and The Movie Channel could be put out of business. While HBO's substantial foothold in the market will probably preserve it for a number of years, its subscribers will undoubtedly begin to disconnect also when they are relegated to only one-half as many new hit movies as they have been offered in the past.

The effect on subscribers will be immediate. Since the existing networks will have no option except to substitute older and poorer pictures, the subscribers will be paying the same amount for programming of diminished quality and appeal. The present 8 million subscribers to pay television (representing several times that number of viewers) will be compelled either to wait nine months to see the defendants' pictures, or to go to motion picture theaters and pay additional money to see them, or to switch to Premiere if the service is available.

*Facial Unreasonableness*

At least one court has recently applied what appears to be a third type of antitrust analysis, somewhere between *per se* treatment and a full-blown rule of reason analysis. In one of the boycott cases cited by the defendants, *United States v. Realty Multi-List, Inc., supra,* the Fifth Circuit declined to find unlawful *per se* the membership criteria of a multiple listing service of a real estate brokers association even though they appeared to be a group boycott. The court found that the multiple listing service provided the benefit of reducing the information, communication, and geographical barriers between buyers and sellers and constituted a market innovation similar to the blanket license in *Broadcast Music, Inc. v. CBS, Inc., supra.* Nevertheless, the court, without conducting a complete rule of reason inquiry, found the membership criteria to be "facially unreasonable." 1980–81 Trade Cases (CCH) at 77,318. The standard the court used required only a finding that the service possessed "sufficient market power that a nonmember can no longer compete effectively with members," *id.* at 77,310, that the restraint was not required to preserve the legitimate needs of the asso-

---

**49.** The withdrawal of these films is likely to increase the prices of the films remaining on the market. It is already evident that the other motion picture producers, recognizing the shortage of product, have started to raise their rates.

**50.** They have, however, licensed films released early enough not to be involved in Premiere's nine-month exclusive. They have also been busily involved in obtaining as much product as possible from the other two major studios and the independents.

ciation, and that the restraint was not sufficiently narrowly tailored to serve its goal. *Id.* at 77,311. Under such an approach, Premiere's restraints would likely be found facially unreasonable.

*Preliminary Injunction Requirements*

 Before granting a preliminary injunction in an antitrust case brought by the Government, a court must determine "whether the Government has shown a reasonable likelihood of success on the merits and whether the balance of equities tips in its favor." *United States v. Siemens Corp.*, 621 F.2d 499, 505 (2d Cir. 1980).

From the extensive submission of evidence in the hearing on the motion for a preliminary injunction, it appears that there is a reasonable likelihood that, at a subsequent trial on the merits of this case, the Government will prove the following:

(1) The defendants, in the formation and operation of Premiere pursuant to the terms of the Premiere agreement, have entered into and are continuing to engage in an unlawful contract, combination, and conspiracy.

(2) The Premiere combination has as a purpose the raising, fixing, or stabilizing of prices of motion pictures licensed by the motion picture company defendants to pay television.

(3) The Premiere combination consists of a continuing agreement and concerted action to refuse to deal with and boycott other existing network program services.

(4) The Premiere combination has had, and will continue to have, the following effects, among others:

(a) the price of motion pictures licensed by the defendant producers to pay television has been, and will continue to be, raised, fixed, stabilized, and maintained at artificial and noncompetitive levels;

(b) competition among the defendants in the licensing of motion pictures to pay television systems has been and will continue to be restrained;

(c) network program services have been and will continue to be deprived of open competition for the licensing of motion pictures; and

(d) network program services (other than Premiere) have been and will continue to be denied access to motion pictures made available to pay television by defendants.

Finally, we turn to the question of the balance of equities. The defendants contend that the Government has the burden of establishing the unavailability of an adequate remedy after trial on the basis of hard evidence as distinguished from speculation or suggested presumptions, citing *United States v. Siemens Corp., supra.* There, the court noted that "once the Government has shown a reasonable likelihood of success on the merits, the equities will usually tip in its favor, since private interests must be subordinated to public ones." 621 F.2d at 506. Recognizing that injunction is a "drastic form of relief," however, the court did not eliminate the necessity of balancing the equities and considering a milder form of relief "where the harm to defendants is great and there is little likelihood" that the violation of the antitrust laws (there, the consummation of a merger) "would jeopardize ultimate relief." *Id.*

Here, the defendants contend that the damage to them would be extraordinary and, indeed, that a preliminary injunction would effectively put them out of business forever, resulting in their loss of most of the more than $10 million they have already invested. To date, defendant Premiere has no subscribers and has a staff of only approximately forty-five persons, most of whom were hired after this litigation was commenced. It has only a few affiliates signed, none since the commencement of this action, perhaps because of the cloud the litigation has put over Premiere's endeavors. This Court cannot evaluate the genuineness of the defendants' contention that a preliminary injunction will end their efforts to enter the pay television market. Nevertheless, their claim that they *cannot* enter the market at any later time seems to ignore the tremendous potential for growth in the pay television industry, of which am-

**434**

ple evidence was presented at the hearing. Moreover, despite their contention that, unless enjoined, they will immediately license their motion pictures to Premiere and start operation, it seems clear to the Court that Premiere faces a substantial startup delay, even without an injunction. In addition, any hardships an injunction will cause the defendants are not as significant as the harm Premiere would probably cause the existing pay television industry.

██ Far more important than the interests of either the defendants or the existing industry, however, is the public's interest in enforcement of the antitrust laws and in the preservation of competition. The public interest is not easily outweighed by private interests. *See United States v. Ingersoll-Rand Co.*, 320 F.2d 509 (3d Cir. 1963). Any doubt concerning the necessity of the safeguarding of the public interest should be resolved by the granting of a preliminary injunction. *See United States v. First National City Bank*, 379 U.S. 378, 383, 85 S.Ct. 528, 531, 13 L.Ed.2d 365 (1965).

The implementation of the Premiere venture has a high potential for the ultimate raising of prices. The defendants have embarked on this venture largely out of dissatisfaction with the revenues they have been obtaining from the network program services for their films. As has been noted, the pricing mechanisms and the boycott embodied in Premiere are likely to enable the defendants to drive up the prices for use of their motion pictures and are also likely to have the indirect effect of driving up the prices for those major motion pictures not controlled by the defendants. These higher prices will be passed on to the consumers. Much of this harm, including the irreparable alteration of the marketplace, would likely occur long before a trial on the merits could be completed.

The Court finds that there is no "effective but less drastic preliminary remedy . . . which will prevent this probable interim harm to the public." *United States v. Culbro Corp.*, 436 F.Supp. 746, 750 (S.D.N.Y. 1977). Consequently, the preliminary injunction will issue.

SO ORDERED.

## ORDER FOR PRELIMINARY INJUNCTION

This cause having come on to be heard upon plaintiff's complaint, its motion for a preliminary injunction and its memorandum of points and authorities in support thereof and defendants' responses thereto, and an evidentiary hearing having been conducted, it appears to the Court that there is a reasonable probability that plaintiff will establish at trial that defendants have entered into an unlawful contract and have engaged in an unlawful combination and conspiracy in restraint of trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. It also appears that a balance of equities tips in favor of plaintiff and that the absence of preliminary injunctive relief may severely limit or frustrate the effectiveness of any order or decree which the Court may render after trial. Consequently, the Court has authority under section 4 of the Sherman Act, 15 U.S.C. § 4, and Rule 65 of the Federal Rules of Civil Procedure to issue such preliminary relief as may be deemed just.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that plaintiff's motion for a preliminary injunction is granted and that defendants Columbia Pictures Industries, Inc., Getty Oil Company, MCA Inc., Paramount Pictures Corporation, Twentieth Century-Fox Film Corporation, and Premiere, their officers, directors, employees, agents, and all other persons acting on their behalf are hereby enjoined and restrained from making available or licensing any motion picture to Premiere, and from taking further steps to effectuate the implementation of Premiere, pending final adjudication of the merits of this case, or the further order of the Court.